United States District Court

Southern District of New York

-----------------------------------------

United States of America,

    -against-                                  20 Cr. 76 (NRB)

Zachary Clark,

               Defendant.

-----------------------------------------

### ZACHARY CLARK'S SENTENCING MEMORANDUM

                                     Federal Defenders of New York

                                       Attorney for Zachary Clark

                                       52 Duane Street - 10th Floor

                                       New York, New York 10007

                                       Tel.: (212) 417-8792

                                       Jonathan Marvinny

                                       *Of Counsel*

To:  Audrey Strauss, Esq.

      United States Attorney

      Southern District Of New York

      One St. Andrew's Plaza

      New York, New York 10007

      Attn:Gillian Grossman, Esq.

          Matthew Hellman, Esq.

          Assistant United States Attorneys

# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

April 28, 2021

By ECF

Honorable Naomi Reice Buchwald
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

**Re:  United States v. Zachary Clark, 20 Cr. 76 (NRB)**

Dear Judge Buchwald:

This memorandum is respectfully submitted in advance of Zachary Clark's sentencing on May 12, 2021. Mr. Clark pled guilty to providing and attempting to provide material support to ISIS, in violation of 18 U.S.C. § 2339B. His Guidelines range is 240 months' imprisonment.[1] As will be discussed below, however, given the equities, the Court should impose a term of incarceration substantially below the Guidelines range, to be followed by a lengthy period of supervised release. This request is supported by the following facts, among others:

- Mr. Clark's offense conduct, though serious, was limited to posting pro-ISIS propaganda and attack-training materials in forums on various messaging applications. He did not attempt to travel abroad to join ISIS; purchase weapons or bomb-making equipment; surveil any attack locations; or attempt to engage in any act of violence whatsoever. His conduct therefore falls at the bottom of the range of material-support offenses;

- His offense is best explained by his traumatic childhood, staggering history of substance abuse, and insufficiently treated mental illness, rather than any commitment to violent ideology;

---

[1] We have no objections to the PSR, apart from the 240-month sentencing recommendation, PSR at 30, which, as will be explained, is vastly greater than necessary to accomplish sentencing goals.

Honorable Naomi Reice Buchwald                    April 28, 2021

United States District Judge                           Page 2 of 15

Re:  United States v. Zachary Clark

    20 Cr. 76 (NRB)

- Testing by a reputed threat-assessment expert, who is most frequently retained by the Government, determined that Mr. Clark poses a "low risk for terrorist targeted violence";
- Mr. Clark is remorseful, is no longer radicalized, and is amenable to mental health and substance abuse treatment; and
- Courts have imposed relatively low sentences of between 48 and 80 months' imprisonment on material-support defendants who have engaged in similar, and even worse, conduct. A sentence equal to or less than those sentences for Mr. Clark would therefore not create unwarranted disparities.

**Zachary Clark**

We begin with a discussion of Mr. Clark's history and characteristics. The facts in this section are drawn primarily from evaluations conducted at our request by two experts—Dr. Kostas A. Katsavdakis, a forensic psychologist and threat-assessment expert, and Dr. Chriscelyn M. Tussey, a neuropsychologist. Dr. Katsavdakis's report is attached as Ex. A, and his CV is attached as Ex. B. Dr. Tussey's report is attached as Ex. C. Additional facts come from the PSR and conversations with Mr. Clark and his family. Only direct quotations from these sources are cited.

*A traumatic, unstable childhood.* Zachary Clark just turned 42; he was born in 1979 in Fort Wayne, Indiana. He had a difficult childhood, to put it mildly. His father, who worked sporadically as a truck driver and in a lumber company, was also in a motorcycle gang. He abused drugs, and physically abused both Mr. Clark and Mr. Clark's mother. Mr. Clark told Dr. Katsavdakis of watching his mother get beaten "viciously" and thrown down the stairs of their home, suffering a broken collarbone as a result. Katsavdakis Rep. at 5.

Mr. Clark's father brutalized him, as well, when he was just a young boy. His father beat him with his hands, and with his belt, causing Mr. Clark black eyes and other injuries. His father would engage in a familiar pattern among abusers—vicious beatings followed by apologies, followed later by more beatings. The abuse continued into Mr. Clark's teen years.

Mr. Clark's mother, also a victim of her husband's abuse, was unable to protect herself or her son. She suffered from bipolar disorder[2] and was addicted to opioids and alcohol. She often

---

[2] Mental illness ran in the family—Mr. Clark's grandmother also suffered from schizophrenia.

Honorable Naomi Reice Buchwald                    April 28, 2021
United States District Judge                             Page 3 of 15

Re:  United States v. Zachary Clark
     20 Cr. 76 (NRB)

lazed about the house high and in a stupor, incapable of intervening to protect Mr. Clark from his
father. Mr. Clark nevertheless loved his parents and tried his best to establish meaningful
relationships with them as he grew older. Unfortunately, both parents passed away about a
decade ago—his father from cancer, and his mother from a drug overdose.

 Mr. Clark's childhood was turbulent for other reasons apart from the abuse he endured. His
family repeatedly relocated and so he attended multiple elementary schools. The family moved
east when he was 10, and spent short stints in New Jersey and Pennsylvania before settling in the
Catskills.

The abuse, the constant moving, and his incipient struggles with mental health and
substance abuse made school difficult for Mr. Clark. He was an average student in elementary
school (though he excelled in art class), but by high school, at Sullivan West Central School in
Jeffersonville, New York, his academic record worsened. He was placed for some time in special
education classes and an "Alternative Education Program" designed for students who struggled
in regular classes. But the extra attention did not help, and he left school altogether at 17. He
would later earn his GED, and attend classes for about a year at a pair of local community
colleges, but he did not earn any college degree.

*Struggles with substance abuse, mental health, and arrests.* Mr. Clark has amassed a truly
staggering lifelong history of drug abuse. He began drinking alcohol at 12 and smoking
marijuana at 13. By 15 he had turned to harder drugs, including crack. At 17 he was using
cocaine and heroin daily. Around that time he was sent to detoxify at a residential facility, his
first of many unsuccessful efforts to get clean. Complicating the picture were Mr. Clark's mental
health struggles. As a teenager he was diagnosed with generalized anxiety disorder, major
depressive disorder, and attention-deficit/hyperactivity disorder (ADHD), and would later be
diagnosed with bipolar disorder.

After he dropped out of high school he began picking up arrests, as his drug addiction
fueled a series of crimes. At 17 he pled guilty to burglary after stealing beer and cigarettes from a
convenience store and served one year in state prison. At 23 he was convicted for reckless
driving while high on marijuana and opioids. At 24 he pled guilty to robbing a store clerk with a
pocketknife and received a six-year sentence.

After his release from prison in 2008, though, Mr. Clark made substantial progress. Most
significantly, he remained drug-free for the majority of his time on post-release supervision, and

Honorable Naomi Reice Buchwald                    April 28, 2021
United States District Judge                      Page 4 of 15

Re:  United States v. Zachary Clark
     20 Cr. 76 (NRB)

was discharged successfully in 2013. In that same period he also enjoyed his longest stretch of
continuous employment, working from 2009 to 2011 at Mother Earth's Storehouse, a natural-
food and vitamin shop in the Hudson Valley.

Almost immediately after his supervision ended in 2013, however, he relapsed into heavy
drug use. In April of that year he entered Westchester County Medical Center to detox from
opioids. Records show that, at the time, he was injecting three bundles of heroin per day. He
would be in and out of that same hospital with alarming frequency in the years that followed,
seemingly unable to escape his addiction. Heroin in particular has wreaked havoc on his life. He
used it daily for 20-plus years; his preferred method of use was injection, a particularly
dangerous way to consume the drug. When he couldn't find heroin, he ingested prescription pills
like Percocet and Xanax. By 36 he was also mainlining MDMA.

*A bright spot: Mr. Clark's devotion to family.* Somehow, amid this troubling history, Mr.
Clark has still managed to demonstrate a fundamental goodness and compassion, particularly in
his care for those closest to him. A bright spot for Mr. Clark was when he met his partner, Brandy
Jimenez, in 2017.[3] They now have a three-year-old son together. In addition, Ms. Jimenez has
three children from a prior relationship with whom Mr. Clark is very close.

Even during the throes of his debilitating drug addiction, Mr. Clark endeavored to be there
for his family. As Brandy recounts: "He took on the daunting task of being a father to 3 children
who are not biologically his and a father to our 3-year-old son. For a while my older children
struggled with the hurt from not having their dad around and Zachary quickly and selflessly
provided them with the love and support they lacked. For that they adore him, as do I." Letter of
Brandy Jimenez.[4]

Ms. Jimenez's middle child, J., confirms Mr. Clark's significant role in his life: "Zachary
Clark is my stepfather but I look up to him as my real father because he has been the only real
father figure in my life, more than my biological father. … He is caring, funny, loving and
selfless. He came into our lives and taught us the importance of family. He picked us up from

---

[3] Mr. Clark married a woman named Brittany Waters in 2015, but their relationship was short-lived.

[4] Letters of support from Mr. Clark's family are attached as Ex. D, in order of citation.

Honorable Naomi Reice Buchwald                     April 28, 2021
United States District Judge                       Page 5 of 15

Re:  United States v. Zachary Clark
     20 Cr. 76 (NRB)

school, made sure we got home safely. The times we came on our own, he always greeted us with a smile and made us feel that he was happy to see us." Letter of J.E.

Ms. Jimenez's oldest child, M., echoes that view: "He always made sure that we sat down to dinner together. He made sure we had game nights and that we did things together outdoors as a family. It's hard to name just a few instances, because truly it is his presence in my daily life that has made all the differences for the better." Letter of M.E.

And Ms. Jimenez's mother describes how Mr. Clark as "was always loving towards me and the rest of the family. He was always willing to help with house work, errands, or just be there to listen to me talk about a hard day's work, or life's disappointments." Letter of Brenda Rodriguez.

That Mr. Clark was able to positively impact the lives of his loved ones despite his own struggles speaks volumes about his true character.

**The offense**

By 2018, Mr. Clark was unraveling. He and Ms. Jimenez were bouncing between homes—for a time they stayed with her mother, but more frequently found themselves at a variety of family shelters throughout New York City. It was far from the first time Mr. Clark had experienced homelessness in his life, but having unstable housing with a young child to care for was particularly taxing.

Mr. Clark was also heavily abusing drugs. That summer he entered treatment at St. Christopher's Inn, a residential treatment program in Garrison, New York, but left against clinical advice after just a month. In November he overdosed on heroin—Ms. Jimenez rushed him to Jacobi Medical Center after finding him unconscious with a needle in his arm. Just a few months later, in February 2019, he was back at Jacobi to attempt to detox after his habit had grown to 20 bags of heroin and three grams of cocaine a day. This is an excerpt from records of his admission on February 21, 2019:

```
Initial Nsg Summary    : Patient is a 39 year old unemployed male
                         seeking detox from heroin.  Alert and
                         oriented x3.  Denies allergy to
                         food/medication.  Patient reported shooting
                         20 bags of heroin and using 3grams of cocaine
                         daily.  with swollen IV tracts on his arms,
                         hands and feet.  With hx of depression and
                         generalized anxiety disorder.  Denies S/H/I
                         nor A/V/H at this time.  patient c/o sweats,
                         chills, and aches.  Oriented to the unit's
                         rules and protocol.  Patient verbalized
                         understanding.
                                           Ryan Angela Dimayuga, RN
                         Report Date:  (21 Feb 19 1148)
```

Honorable Naomi Reice Buchwald                    April 28, 2021
United States District Judge                      Page 6 of 15

Re:  United States v. Zachary Clark
     20 Cr. 76 (NRB)

Mr. Clark was at an emotional and physical nadir that would lead him to dark places. Just a
month later he would begin posting ISIS-related material.

    Mr. Clark was first exposed to Islam in his twenties, while serving a six-year robbery
sentence in New York State prison. It was later, however, during the difficult year of 2018, that
he began to take the religion more seriously. He spent more and more time online researching
Islam. He told Dr. Katsavdakis that, at first, he sought friendship and support and little else.
Katsavdakis Rep. at 9. Over time he found that he felt sympathy for people in the Middle East
who "were being bombed [and] being hurt." *Id.* at 10.

    His forays onto the internet eventually exposed him to people with radical views of the
religion, including ISIS sympathizers. He did not share their violent impulses, but was swayed
by their rhetoric and seeming devotion to their beliefs. He eventually pledged allegiance to ISIS
and began administering multiple ISIS-related "channels," or, forums, on various encrypted
messaging applications. In those channels he posted propaganda and "attack training manuals,"
including bomb-making instructions.  PSR ¶¶ 24–27. Mr. Clark would later tell a confidential
source that he wanted to "do media" for ISIS. PSR ¶ 32, and that his posting of the various
materials was "[his] jihad." PSR ¶ 69.

    The PSR contains florid descriptions of the materials Mr. Clark posted. As a general matter,
though, he did not draft the materials, and instead republished those already in the public
domain. *See, e.g.*, PSR ¶ 39 ("The investigation revealed that *Inspire* magazine, a propaganda
publication by a designated foreign terrorist organization called al-Qaeda in the Arabian
Peninsula (AQAP), originally published the bomb-making instructions (the AQAP Bomb
Manual) [posted by Mr. Clark].");  ¶ 41 ("Clark also posted an essay, which was originally posted
by [] a leader and spokesman for AQAP, encouraging readers to commit attacks . . . ."). And,
critically, by the time of his arrest in late-November 2019, he had voluntarily stopped posting in
the forums months earlier. As he explained to Dr. Katsavdakis, "I felt as though I got carried
away. … I had a change of heart, snapped back to reality." Katsavdakis Rep. at 10.

    Mr. Clark never attempted to travel abroad to join ISIS, and never attempted to commit an
act of violence at any point. Nevertheless, he knows that his online activities were serious,
wrong, and unlawful. When speaking with Dr. Katsavdakis, he described the anger that had
motivated his online postings this way: "It was misdirected, anger built up. It was not placed
properly. I was very angry with myself and the way I grew up. Negativity, pessimism, I found
people online that were negative and then I spiraled out of control." *Id.* Echoing this view, his

Honorable Naomi Reice Buchwald                    April 28, 2021
United States District Judge                      Page 7 of 15

Re:  United States v. Zachary Clark
     20 Cr. 76 (NRB)

partner, Ms. Jimenez, says, "I know him very well and believe that he was never in a war against
our country, instead he was in a war against himself. He is full of regret and deep remorse
everyday. For the choices he made, for going against who he really is by nature, and for the
difficulty and sadness this has caused for our children and myself." Letter of Brandy Jimenez.

**The experts' findings**

*Dr. Katsavdakis's Report.* We begin with a word on Dr. Katsavdakis. He is a licensed
forensic psychologist who specializes in threat assessment, and is a published author and leading
expert on radicalization. He is no defense partisan. He is instead most frequently retained by the
Government, particularly the U.S. Attorney's Office in EDNY, where he helps conduct threat
assessments of defendants being considered for that district's Disruption and Early Engagement
Program ("DEEP"), a counterterrorism and prevention initiative begun in 2016. *See, e.g.*, *United
States v. Ceasar*, 388 F. Supp. 3d 194, 208–12 (E.D.N.Y. 2019) (noting that Dr. Katsavdakis—
"the government's expert on threat assessment"—had found that defendant posed "a moderate
risk for violent/extremist beliefs, further radicalization, and possible acts").

Dr. Katsavdakis evaluated Mr. Clark in person and, after the onset of the COVID-19
pandemic, via videoconference, and reviewed voluminous records. He administered, scored, and
interpreted the Terrorist Radicalization Assessment Protocol–18 (TRAP-18), "a structured
professional judgment instrument for assessing risk of terrorist violence across the entire
spectrum of ideologically motivated individuals, whether jihadists, right-wing extremists, or
single-issue perpetrators." Katsavdakis Rep. at 11.

Dr. Katsavdakis opines: "Based on the overall TRAP-18, Mr. Clark currently poses a **low
risk for terrorist targeted violence**." *Id.* at 12 (emphasis added). Critical to Dr. Katsavdakis's
conclusion were that Mr. Clark "did not engage in direct planning or behavior indicating that he
was preparing to carry out an attack" and that, as a general matter, he "reposted links/documents
rather than original writings or manifestos." *Id.* And, though Mr. Clark identified with and
pledged allegiance to ISIS, he "did not demonstrate operational preparatory behavior such as
probing or breaching of targeted facilities." *Id.*

Rather than a committed jihadist, Dr. Katsavdakis found Mr. Clark a sad, sick man whose
drug abuse and inadequately treated mental health issues directly contributed to his offense
conduct: "Mr. Clark's radicalization is best conceptualized via the lens of his chronic, persistent,

Honorable Naomi Reice Buchwald                    April 28, 2021
United States District Judge                            Page 8 of 15

Re:   United States v. Zachary Clark
      20 Cr. 76 (NRB)

and escalating drug use, impulsivity, racing thoughts and lack of inhibitory controls rather than predatory attempts to engage in an extremist religious war against the U.S." *Id.* at 13.

    *Dr. Tussey's Report.* Dr. Tussey, a board-certified forensic neuropsychologist, conducted an evaluation of Mr. Clark after Dr. Katsavdakis questioned whether Mr. Clark might have suffered organic brain damage due to his extreme history of substance abuse. Dr. Tussey interviewed Mr. Clark over three videoconference sessions and administered a battery of psychological tests. Though her evaluation was complicated by certain technological limitations, she was able to obtain useful data concerning Mr. Clark's cognitive functioning. Dr. Tussey's testing revealed that "Mr. Clark's intellectual and cognitive abilities, including verbal, language, and memory, are generally Average." Tussey Rep. at 9. She opined: "Mr. Clark's cognition is strikingly intact given his reported history of substance use, overdoses, head injuries resulting in loss of consciousness, and potential medical history." *Id.*

**The Guidelines**

    Mr. Clark accepted a plea agreement that includes a terrorism enhancement, U.S.S.G. § 3A1.4, that serves to increase his offense level by 12 levels and place him in Criminal History Category VI. Absent that enhancement, his Guidelines range would be 84 to 105 months' imprisonment (Offense Level 25, Criminal History Category IV). Because of the enhancement, however, his Guidelines range is elevated to 360 months to life, though the range is capped at 240 months because that is the statutory maximum for his offense. Mr. Clark intends to abide by his plea agreement, of course. Nevertheless, in this section we discuss pertinent criticisms of the terrorism enhancement that should factor into the Court's assessment of the appropriate sentence.

    To begin, Mr. Clark's crime is not actually the sort of offense to which Congress originally intended the terrorism enhancement to apply. The enhancement is the result of a 1994 provision in which Congress directed the Sentencing Commission to create a sentencing guideline that increased the penalty for crimes that did not have terrorism as an element, but which involved or were intended to promote terrorism:

> The United States Sentencing Commission is directed to amend its sentencing guidelines to provide an appropriate enhancement for any felony, whether committed within or outside the United States, that involves or is intended to promote international terrorism, *unless such involvement or intent is itself an element of the crime.*

Honorable Naomi Reice Buchwald                    April 28, 2021
United States District Judge                      Page 9 of 15

Re:   United States v. Zachary Clark
      20 Cr. 76 (NRB)

Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, Title XII,
§ 120004, 108 Stat. 1796 (emphasis added). Nevertheless, § 3A1.4, Sentencing Guidelines
Amendment 526, is applicable to all crimes intended to promote terrorism—even if they already
have intent to promote or involvement with terrorism as an element.

    Over the years, Congress has directed the Commission to promulgate additional terrorism-
related sentencing enhancements and to increase Guidelines penalties for terrorism offenses. But
the fact that § 3A1.4(a)'s operation here remains inconsistent with Congressional intent can be
seen from the applicable statutory penalties. Congress set a maximum penalty of 20 years in
prison for Mr. Clark's offense. Yet § 3A1.4 pushes his recommended sentence—indeed, the
recommended sentence of *every* defendant charged with this offense—over the absolute
maximum set by Congress. It cannot be that Congress intended every person convicted of this
offense to be sentenced over the very maximum that Congress itself set for the crime.

    This problem might be counterbalanced if the enhancement were supported by some sort of
empirical research or other Sentencing Commission expertise. But it is not. As Senior District
Judge Breyer aptly explained recently, the enhancement is not a product of Commission
expertise and is based largely on "unsubstantiated assumptions about recidivism." *United States
v. Alhaggagi*, 372 F. Supp. 3d 1005, 1014–16 (N.D. Cal. 2019), *rev'd on other grounds*, 978 F.3d
693 (9th Cir. 2020).

    Moreover, the terrorism enhancement has the most troubling characteristics that the Second
Circuit has identified in other problematic Guidelines, and which the Circuit has instructed
district courts to apply with "great care" because they can "easily generate unreasonable results."
*See United States v. Dorvee*, 616 F.3d 174, 184, 188 (2d Cir. 2010). In *Dorvee*, the Second
Circuit found a within-Guidelines child-pornography sentence substantively unreasonable. *Id.* at
188. In its analysis, the Circuit explained that the applicable Guideline was problematic because
it had enhancements that were not based on empirical data developed by the Sentencing
Commission and which were "all but inherent in the crime of conviction"; the Guideline drew
"no distinction" between "the most dangerous offenders" and others; and the Guideline
recommended sentences for all offenders at or near the statutory maximum, which "eviscerates
the fundamental statutory requirement[s]" of § 3553(a). *See Dorvee*, 616 F.3d at 187.

    As at least one court in this district has observed, "The same bases for concern that the
Second Circuit articulated in *Dorvee* with respect to § 2G2.2 are equally applicable to the
Terrorism Enhancement" in § 3A1.4(a). *United States v. Nayyar*, No. 09 Cr. 1037 (RWS), 2013

Honorable Naomi Reice Buchwald                     April 28, 2021
United States District Judge                       Page 10 of 15

Re:  United States v. Zachary Clark
     20 Cr. 76 (NRB)

WL 2436564, at *8 (S.D.N.Y. June 5, 2013) (sentencing defendant below range because
following the Guideline "would have the ultimate effect of punishing [the defendant] as harshly
as someone who had actually committed acts of terroristic violence").

**The Court should impose a substantially below-Guidelines sentence.**

     In any event, as this Court knows, the Guidelines range is but one of many factors set forth
in 18 U.S.C. § 3553(a) that a district court is to consider when imposing sentence. *See generally*
*United States v. Booker*, 543 U.S. 220 (2005). "The Guidelines are not only not mandatory on
sentencing courts; they are also not to be presumed reasonable." *Nelson v. United States*, 129 S.
Ct. 890, 892 (2009) (emphasis in original).

     The overarching command of § 3553(a) is that sentences should be "sufficient, but not
greater than necessary," to achieve the basic goals of retribution, deterrence and rehabilitation. To
arrive at such a sentence, district courts are directed to consider: (1) the nature and circumstances
of the offense and the history and characteristics of the offender; (2) the need for the sentence
imposed to provide just punishment, deterrence, and needed educational and vocational training;
(3) the kinds of sentences available; (4) the Guidelines-range and any pertinent policy statements
issued by the Sentencing Commission; (5) the need to avoid unwarranted sentence disparities
among similarly situated defendants; and (6) the need to provide restitution. *See* § 3553(a). In
every case, the sentencing court "must make an individual assessment based on the facts
presented." *Gall v. United States*, 128 S. Ct. 586, 597 (2007).

     Here, after applying the § 3553(a) factors, the Court should impose a term of incarceration
substantially below the Guidelines range, to be followed by a lengthy term of supervised release.

     *Mr. Clark's history and characteristics.* We have discussed these at great length. Mr. Clark's
abusive childhood, and his history of substance abuse, mental health, and homelessness mitigate
and contextualize his offense, even though they do not excuse it. They accordingly support our
requested below-Guidelines sentence.

     *The nature and circumstances of the offense.* We have repeatedly acknowledged the
wrongfulness of Mr. Clark's conduct. But that conduct falls at the absolute bottom of the range of
material-support offenses. Mr. Clark never left New York City. He did not travel, or attempt to
travel, abroad. He did not engage in any acts of violence. He did not draft any of the materials he
posted. He did not purchase weapons or any bomb-making equipment. He did not surveil any
attack locations. And, critically, while Mr. Clark had some vague discussions with a confidential

Honorable Naomi Reice Buchwald                    April 28, 2021

United States District Judge                              Page 11 of 15

Re:  United States v. Zachary Clark
     20 Cr. 76 (NRB)

course about the possibility of committing an attack, those conversations never went anywhere. In mid-2019, the source attempted to have Mr. Clark to meet with undercover agents, but Mr. Clark refused. *See* PSR ¶ 34. The nature of the offense therefore supports our requested sentence.

*Just punishment.* When considering just punishment, it bears noting that Mr. Clark's time in custody, at both the MCC and the Westchester County Jail (WCJ), has been far more punitive than usual. MCC was already experiencing draconian lockdowns for various reasons—including that an inmate had supposedly possessed a loaded firearm—when the COVID-19 pandemic struck in March 2020. Both the MCC and WCJ have had high COVID-19 numbers since the onset of the pandemic. At the same time, the measures that have been taken over the last year to mitigate the spread of the virus have proven harsh and isolating: Family visitation has been suspended, as have communal dining, the use of recreation equipment, and contact legal visits. Time outside of prisoners' cells has been limited and, even then, has felt unsafe.

Courts have recognized that the deplorable conditions in our area jails during the pandemic have vastly increased the punitive nature of a person's incarceratory experience. As Judge Engelmayer has explained, while prison is supposed to be punitive, it is not meant to be this brutal, and courts should take a person's incarceratory experience into account when fashioning an appropriate sentence:

Finally, I am mindful … that you have served most of your time in prison so far during the worst pandemic in this country during the past 100 years. … Bottom line, your time in the MCC was way harder than anyone intended when you were detained following your arrest. Any mature system of justice, any thoughtful judge in imposing the reasonable sentence here would have to recognize the unexpected and regrettable ardors that you experienced since your arrest in December.

*United States v. Aracena De Jesus*, 20 Cr. 19 (PAE), Sent'g Tr. at 36–37 (Jul. 1, 2020) (Ex. E). This Court should similarly take these factors into account when determining Mr. Clark's sentence.

*Deterrence and incapacitation.* Mr. Clark is not permanently radicalized—to the contrary, he is keenly aware of the wrongfulness of his conduct. In discussions with both Dr. Katsavdakis and Dr. Tussey, Mr. Clark expressed insight into, and remorse for, that conduct. Dr. Tussey notes that these are "positive prognostic indicators for incremental success." Tussey Rep. at 12.

Honorable Naomi Reice Buchwald                    April 28, 2021
United States District Judge                             Page 12 of 15

Re:   United States v. Zachary Clark
        20 Cr. 76 (NRB)

In a searching letter to this Court, Mr. Clark explains the depth of his regret: "I want to make clear that I do not support the ideals and actions of the Islamic state. I feel guilty for the things I posted and for the impact they could have had on others. I knew at the time that I would never harm another person, but I did not know what others were capable of, and how the things I posted might have impacted them. I am sorry for what I did." Letter of Zachary Clark (Ex. F).

Further evidencing Mr. Clark's remorse is that, from the very beginning of his case, he expressed interest in participating in a deradicalization program, were one available. Counsel requested that the Government agree to help place him in one, but the request was denied. This was unfortunate, since, as one court has explained in a remarkably similar case, "The ideal sentence, in the court's estimation [] would be Defendant's placement in a deradicalization or disengagement program with provision for intensive educational, emotional, and economic support to address [his] childhood trauma and its attendant results." *Ceasar*, 388 F. Supp. 3d at 220.

In any event, Mr. Clark has expressed to counsel that, upon his release, he is interested in working with youth who are on the verge of radicalization, so that they might avoid making the same mistakes he did. This demonstrates that he fully understands the wrongfulness of his conduct, is sufficiently deterred, and is not a threat to reoffend. This is particularly so in light of Dr. Katsavdakis's conclusion that he poses a low risk for terrorist violence.

*The need for effective treatment.* This factor strongly supports our requested sentence. Dr. Tussey notes that, given Mr. Clark's background, prolonged incarceration would increase the likelihood of negative outcomes in the future, including relapse and even death. Tussey Rep. at 9. She recommends that Mr. Clark participate in comprehensive substance abuse treatment "as the relationship between polysubstance abuse and Mr. Clark's behavior is paramount." *Id.*

That Mr. Clark's cognitive functioning remains "intact" bodes well for his chances of meaningfully participating in treatment so that he stays drug-free, and law-abiding, in the future. *Id.* at 11. Dr. Tussey notes that, while on supervised release, he would benefit from intensive drug treatment. She writes:

A strict[] supervised release program, in conjunction with immediate access to ongoing substance abuse and mental health treatment, may provide Mr. Clark the best chance of interrupting the revolving door back to prison or avoiding death due to overdose. Such a program can increase the chances that post-release, he will have adequate tools in place to

Honorable Naomi Reice Buchwald                    April 28, 2021
United States District Judge                      Page 13 of 15

Re:  United States v. Zachary Clark
     20 Cr. 76 (NRB)

     assist with his re-entry transition, in turn ideally reducing his risk for relapse and
     recidivism.

*Id.* at 11.

     Of note is that Mr. Clark was able to achieve sobriety from 2008 to 2013, while under New
York State supervision. During that period he stayed clean and held down a good job, showing
that he can remain sober under the right circumstances. And Mr. Clark is already attempting to
make the most of the meager treatment resources available to him while in jail. Since January
2021 he has been enrolled in the Solutions substance abuse program inside the WCJ. Through
that program he engages in cognitive behavioral interventions into substance abuse. *See* Letter of
Solutions Program (Ex. G).

     Also critical is the fact that Mr. Clark has a good support system awaiting him, particularly
Ms. Jimenez, her children, and the child they have together. Ms. Jimenez is well aware of Mr.
Clark's struggles with substance abuse, and knows that his staying clean will not be easy. But she
is committed to seeing him succeed: "I will be here to support him through the coming years and
beyond, as he has been a loving and integral part of our family and will continue to be." Letter of
Brandy Jimenez.[5]

     *Unwarranted sentence disparities.* Finally, a substantially below-Guidelines sentence would
be in accord with sentences imposed in cases similar to Mr. Clark's. Here are some examples of
such sentences:

   • In *United States v. Ceasar*, 388 F. Supp. 3d 194 (E.D.N.Y. 2019), previously
     discussed, the defendant posted ISIS propaganda online; worked to recruit ISIS
     members; connected to individuals affiliated with ISIS; obtained a visa for

_____

[5] Though the PSR contains the claim that Ms. Jimenez "was fully aware of Clark's radicalization and
generally supportive of his allegiance to ISIS," PSR ¶ 80, Ms. Jimenez denies that claim in her letter to
this Court. She explains: "I do not and have never shared or supported any of the views or beliefs that
landed Zachary in jail. I feel very strongly against anything that advocates violence and a division of
people based off of religion, race, color, creed or social status. I would never allow this around my
children or myself, and Zachary has never spoken of these things to us. Nor does he hold these beliefs any
longer." Letter of Brandy Jimenez.

Honorable Naomi Reice Buchwald                    April 28, 2021
United States District Judge                      Page 14 of 15

Re:  United States v. Zachary Clark
     20 Cr. 76 (NRB)

> Afghanistan; and attempted to travel to Turkey. Considering her history of trauma and
> mental illness, the district court sentenced her to 48 months.

- In *United States v. Asher Abid Khan*, No. 15 Cr. 263, ECF No. 188 (S.D. Tex. 2019),
  the defendant expressed radical Islamist views online, discussed his desire to join
  ISIS, agreed with a friend to travel to the Middle East, contacted someone in Turkey to
  arrange travel to join ISIS, and traveled overseas before returning home to Texas. The
  district court sentenced him to 18 months, considering the fact that he did not truly
  have a desire to influence a foreign government, that he was remorseful, and that he
  appeared to have rehabilitated himself.

- In *United States v. Islam Said Natsheh*, No. 16 Cr. 166 (RS), ECF No. 20, 23 (N.D.
  Cal. 2016), the defendant posted comments on social media supporting ISIS and
  attempted to travel to Turkey (and ultimately Syria) to join ISIS. The district court
  sentenced him to 60 months, considering his young age, history of depression, and
  other mitigating factors.

- In *United States v. Aaron T. Daniels*, No. 16 Cr. 222, ECF No. 87, 93 (S.D. Ohio
  2018), the defendant expressed interest in jihad, contacted an ISIS recruiter, sent
  money to a member of the Islamic State, and attempted to travel to Libya to join ISIS.
  Considering mitigating factors, including the defendant's schizophrenia, the district
  court sentenced him to 80 months, or less than seven years.

In many ways, these defendants' conduct was more serious than Mr. Clark's, given that all
of them traveled or attempted to travel abroad to join ISIS, among other aggravating factors.
Their cases, then, should be considered an upper bound on the appropriate term of incarceration
for Mr. Clark.

At the same time, Mr. Clark should be placed on a lengthy period of supervised release. He
would very much benefit from the Probation Department's resources—particularly its ability to
place him in comprehensive, structured substance abuse and mental health treatment. And, while
on supervised release, Mr. Clark can be closely monitored to make sure he lives up to his
expressed intentions of staying drug free, avoiding violent, radical activities, and remaining
devoted to his family. Were he to reoffend in any way, of course, the Court would be informed
and would be able to sanction him accordingly.

—

Honorable Naomi Reice Buchwald                  April 28, 2021
United States District Judge                    Page 15 of 15

Re:  United States v. Zachary Clark
     20 Cr. 76 (NRB)

     For the reasons discussed, the Court should impose a sentence substantially below the Guidelines range, to be followed by a lengthy period of supervised release.

Sincerely,

/s/ Jonathan Marvinny
Jonathan Marvinny
Assistant Federal Defender
212.417.8792
jonathan_marvinny@fd.org

# EXHIBIT A

**[REDACTED]**

# EXHIBIT B

### KOSTAS A. KATSAVDAKIS, PH.D., ABPP
**Diplomate in Forensic Psychology**
**American Board of Professional Psychology**
New York License 015018-1; Connecticut License 003465

1-212-571-4249
1-718-926-9489

### Career Summary
Psychologist with an expertise in clinical, diagnostic and forensic evaluations with adults and juveniles.

### Education
| | |
|---|---|
| 2013 | Diplomate in Forensic Psychology, American Board of Professional Psychology |
| 1997-2000 | Postdoctoral Fellowship in Clinical Psychology, Menninger Clinic, Topeka, KS |
| 1996-1997 | Postdoctoral Fellowship in Psychology, Mercy Hospital, San Diego, CA |
| 1991-1996 | PhD, California School of Professional Psychology, San Diego, CA |
| 1985-1991 | BA, Bernard M. Baruch College, New York City, NY |

### Clinical and Forensic Experience

10/04 – now    *Forensic and Clinical Practice – Professional Corporation*
- Conduct forensic evaluations – adult and juvenile.
  - Sexual and Non-Sexual Offender risk assessments
  - Criminal competency
  - Criminal responsibility
  - Mitigation
- Threat Assessment and Management
- Provide individual therapy for adults, adolescents and children.
- Conduct psychological and forensic testing.
  - adult and juvenile
- Assess impaired professionals.
- Provide individual therapy for sexual disorders.

1/03-9/04    *Kirby Forensic Psychiatric Center, New York*
*Assistant Director of Psychology (1/04-9/04)*
- Oversee development of risk assessment and research for Sexual Treatment Offender Program.
- Assess, evaluate and restore individuals found not competent to stand trial.
- Conduct comprehensive risk assessments.
- Conduct sexual offender risk evaluations.
- Testify in New York State Supreme Court.

7/01-12/02    *Staff Psychologist*
*Heritage Mental Health Clinic, LLC*
- Assess and evaluate impaired professionals.
- Conduct forensic evaluations - related to criminal risk issues.
- Carry out parenting evaluations for the court.
- Conduct psychological testing – approximately 2 batteries per month.
- Assess and treat adults with paraphilic disorders or sexual deviations.
- Conduct brief supportive, psychodynamic, cognitive therapy with adults.
- Evaluate and treat children with mood and anxiety disorders.
- Manage clinic website

Kostas A. Katsavdakis, Ph.D., ABPP
Page 2 of 12

2/99–7/01    *Staff Psychologist and Principal Investigator for Clinical Protocols and Outcomes*
             *The Menninger Clinic, Topeka, Kansas*
- Lead, as primary interviewer, multidisciplinary psychiatric team for weeklong outpatient adult and child diagnostic evaluations.
- Conduct psychological testing (e.g., with impaired professionals).
- Conduct brief supportive, psychodynamic, cognitive therapy with adults.
- Assess and treat adults with paraphilic disorders or sexual deviations.
- Assess the presence and severity of psychopathic and antisocial behavior.
- Conduct play therapy with children and adolescents.
- Carry out parenting evaluations for the court.
- Develop, manage, and oversee treatment outcomes studies.
- Develop computerized medical record.
- Teach introductory research and statistics.
- Teach cross-cultural issues in psychological testing.

9/97–3/00    *Postdoctoral Fellow in Clinical Psychology* (two one-year rotations)
             *The Menninger Clinic, Topeka, Kansas*

*First rotation:*
- Served as hospital doctor.
- Admitted, discharged, diagnosed, formulated, and coordinated treatment of patients in the Addiction Recovery Program inpatient and residential units.
- Directed multidisciplinary team (psychiatrist, social worker, addictions counselor, primary nurse, and mental health worker) for dual-diagnosis patients.

*Second rotation:*
- Fulfilled duties of testing psychologist on multidisciplinary treatment team for weeklong diagnostic evaluations.
- Conducted child play therapy.

*Both rotations:*
- Completed approximately 40 psychological test batteries.
- Administered, interpreted, and assimilated information from WAIS-III, MMPI-2, MCMI-III, Rorschach, TAT, Word Association Test, and Babcock Story Recall.
- Developed multitrait/multimethod matrix to test validity and reliability of an outcomes measure assessing treatment efficacy.
- Developed automated medical record.
- Completed six hours of training seminars weekly and six hours of supervision per psychological battery.
- Conducted individual supportive and expressive psychotherapy with adults.
- Conducted supportive and psychoeducational group psychotherapy with latency-age boys (ages 6–11) with attention deficit disorder and social skills deficiencies.

10/96–7/97   *Postdoctoral Fellow*
             *Behavioral Health Center–Mercy Hospital, San Diego, California*
- Served as member of psychiatric evaluation and triage team.
- Conducted assessment and facilitated admission, discharge, or commitment of patients in busy downtown city emergency room.
- Consulted extensively for oncology, trauma, intensive care, and telemetry units.

Kostas A. Katsavdakis, Ph.D., ABPP
Page 3 of 12

## Professional Teaching

8/04-present   *Assistant Professor and Adjunct Professor*
               *John Jay College of Criminal Justice, New York City, New York*
               Graduate Courses in Forensic Criminal Testing and Personality Assessment
               Undergraduate Courses in Psychology and the Law, Advanced Seminar in Youth, Family and the
               Criminal Justice System, Seminar in Psychological Analysis of Criminal Behavior and the
               Criminal Justice System.

8/00–9/00      *The Menninger Clinic, Topeka, Kansas*
               Introduction to Research

3/97–5/97      *Chapman University, San Diego, California*
               Research and Bibliographic Methods

1/96–6/96      *California Polytechnic State University, Dept. of Statistics, San Luis Obispo, California*
               Introductory and Intermediate Statistics

9/92–6/95      *California School of Professional Psychology, San Diego, California*
               Statistics for Graduate Level Psychology Students

## Research Activities

2/03-9/04      *Program Evaluation for Sexual Offender Treatment Program*
               Developed comprehensive risk assessment process with goal of evaluating patient's progress in
               sexual offender treatment program.

3/03-6/04      *Inter-rater reliability for Rorschach protocol administered in Greek language*
               Applying the Exner Scoring System to a series of Rorschach protocols administered in the Greek
               population.

6/00–7/02      *Impaired Professionals Study*
               Describing demographic characteristics of impaired health professionals seeking mental health treatment.

3/98–6/01      *Psychometric Assessment and Development of Quality-of-Life Outcomes Measure*
               Developed and analyzed quality of life and treatment satisfaction measures for outcomes studies.

3/98–6/01      *Adult Treatment Outcomes Research Project*
               Developed treatment outcomes studies to measure patient change in functioning from admission to
               discharge.

3/98–3/00      *Projective Testing with Bilingual Patients*
               Conducted a cross-cultural study to analyze narrative content and process differences among bilingual
               individuals who are given the Thematic Apperception Test in their mother tongue versus in an acquired
               language.

## Publications

Katsavdakis, K.A., Meloy, J.R., & White, S.J. (2011) A female mass murder. Journal of Forensic Sciences, Journal
of Forensic Sciences, 56(3), 813-818.

Cohen, L.J., Frenda, S., Mojtabai, R., Katsavdakis, K., & Galynker, I. (2007). Comparison of
sexual offenders against children to sexual offenders against adolescents and adults: Data from the New York Sex
Offenders Registry.  Journal of Psychiatric Practice, 13(6), 373-384.

**Kostas A. Katsavdakis, Ph.D., ABPP**
**Page 4 of 12**

Katsavdakis, K.A., Gabbard, G.O., & Athey, G.I. (2004). Profiles of impaired health professionals. Bulletin of The Menninger Clinic, 68(1), 60-72.

Clifford, P., Katsavdakis, K.A., Lyle, J.L., Fultz, J. Allen & Graham, P. (2002). How Are You? Further development of a generic quality of life outcome measure. Journal of Mental Health, 11(4), 289-404

Katsavdakis, K.A., Sayed, M., Bram, A. & Bartlett, A. (2001). How was this story told in the mother tongue? An integrative perspective. Bulletin of the Menninger Clinic, 65, 246-265.

Katsavdakis, K.A., Clifford, P.I., Evans, R., Graham, P., Allen, J.G., Sargent, J., Lyle, J., & Frager, D. (1999). The How Are You?  A quality-of-life outcomes measure for routine practice. Bulletin of the Menninger Clinic, 63(3), 366-387.

### Book Reviews

Katsavdakis, K.A. (2001). Book review of *Personality and culture: Clinical and conceptual interactions* by R.D. Alcaron, E.F. Foulks, &  M. Vakkur (New York: John Wiley & Sons, Inc.). Bulletin of the Menninger Clinic.

Katsavdakis, K.A. (1999). Book review of *Altering fate: Why the past does not predicts the future* by M. Lewis (New York: Guilford Press).      Bulletin of the Menninger Clinic, 63(2), 255-258.

### Menninger Research Department Technical Reports

Katsavdakis, K.A., Barber, C.C., Target, M., Fonagy, P., Clifford, P., Lyle, J.L., Frager, D., Fultz, J. Allen, J.G., & Graham, P. (2001). Development of Adult and Child Psychosocial Assessments for the Menninger Clinic. Technical Report No. 01-0046.) Topeka, KS: Menninger Clinic, Research Department.

Barber, C.C., Target, M., Fonagy, P., Katsavdakis, K.A., & Clifford, P. (2001) Children's FACE: A Comprehensive Developmentally-tailored Rating System for Children and Adolescents. (Technical Report No. 01-0047.) Topeka, KS: Menninger Clinic, Research Department.

Katsavdakis, K.A., Clifford, P., Lyle, J.L., Fultz, J. Allen & Graham, P. (2001) The Revised How Are You? Scale. (Technical Report No. 00-0038.) Topeka, KS: Menninger Clinic, Research Department.

Katsavdakis, K.A., Lyle, J.L., Allen, J.G., Fultz, J. & Graham, P. (2001) Treatment Outcomes and Patient Satisfaction in The Menninger Clinic Adult Services: Results of Patient Self-Assessment from April 2000 to September 2000. (Technical Report No. 00-0039.) Topeka, KS: Menninger Clinic, Research Department.

Allen, J.G. Lyle, J.L., Graham, P., Fultz, J. & Katsavdakis, K.A. (2000). Treatment Outcomes and Patient Satisfaction in The Menninger Clinic Adult Services: Results of Patient Self-Assessment from October 1999 to March 2000. (Technical   Report No. 00-0020.) Topeka, KS: The Menninger Clinic, Research Department.

Allen, J.G. Graham, P., Katsavdakis, K.A., Lyle, J.L. & Richard B. Evans, PhD. (1999). Protocol for Assessing Treatment Outcomes in The Menninger Clinic Adult Services. (Technical Report No. 99-0011.) Topeka, KS: Menninger Clinic, Research Department.

Holigrocki, R. J., Frieswyk, S. H., Kaminski, P. T., Betan, E., Katsavdakis, K. & Fantz, C. M. (1999). PAS: Parental Attunement Scale. (Tech. Rep. No. 99-1047). Topeka, KS: Child and Family Center, The Menninger Clinic, Research Department.

Kostas A. Katsavdakis, Ph.D., ABPP
Page 5 of 12

### Presentations

Katsavdakis, K.A. (February 2020). Advanced Assessment of Sexual Offenders: Child Pornography, Sexual Sadistic and Female Offenders.  American Academy of Forensic Psychology, Washington D.C.

Katsavdakis, K.A. (February, 2020).  Advanced Threat Assessment and Management. American Academy of Forensic Psychology, Washington D.C.

December 2019. Cutting Edge Tactics for Threat Assessment, Mitigation, Disruption and Early Engagement Symposium; United States Department of Justice, Washington, D.C.

Katsavdakis, K.A. (June 2019).  The Implementation and Utilization of Threat Assessment and Management Teams in Healthcare Settings.  Central Minnesota Healthcare Preparedness Coalition, CentraCare Health, St. Cloud, Minnesota.

Katsavdakis, K.A. (June 2019).  Advanced Threat Assessment and Management. American Academy of Forensic Psychology, Burlington, Vermont.

Katsavdakis, K.A. (May 2019). The Assessment of Risk in Stalking Cases.  American Institute for Advancement of Forensic Studies, Minneapolis, Minnesota.

Katsavdakis, K.A. (February 2019). Advanced Assessment of Sexual Offenders: Special Topics Include Non-Contact and Sexual Sadistic Offenders and Possession of Child Pornography.   American Academy of Forensic Psychology, Charleston, South Carolina.

Katsavdakis, K.A. (December 2018) Threat and Risk Assessment and Management: Connecting the Dots, Strategic Interventions for the Prevention of Violence in School Settings.  American Institute for Advancement of Forensic Studies, Minneapolis, Minnesota.

Katsavdakis, K.A. (October 2018) Threat and Risk Assessment and Management in Workplace Settings.  Bronx Lebanon Hospital Center.

Katsavdakis, K.A. (October 2018) Threat and Risk Assessment and Management: Connecting the Dots, Strategic Interventions for the Prevention of Violence in School Settings.  Herricks Union Free School District, Herricks, NY. October 1st and 4th, 2018.

Katsavdakis, K.A. (June 2018). The Role of Psychiatry & Mental Health Professionals in Threat Assessment and Management.  The Hellenic Medical Society of New York. New York City, NY.

Katsavdakis, K.A. (April 2018).  Advanced Threat Assessment and Management. American Academy of Forensic Psychology, New Orleans, Louisiana.

Katsavdakis, K.A. (April 2018). Advanced Assessment of Sexual Offenders: Special Topics Include Non-Contact and Sexual Sadistic Offenders and Possession of Child Pornography.   American Institute for Advancement of Forensic Studies, Minneapolis, Minnesota

Katsavdakis, K.A., Co-Panelist (March 2018). Scientific Sessions, Symposium G: The Assessment Framework: Testing the Limits in Administration and Interpretation.  Society for Personality Assessment, Washington D.C.

Katsavdakis, K.A., Co-Panelist (February, 2018). Preventing the Next Attack: Cutting Edge Tools for Law Enforcement. NYPD Annual Cyber Intelligence and Counterterrorism Conference. New York, N.Y.

Katsavdakis, K.A. (February, 2018).  Advanced Threat Assessment and Management. American Institute for Advancement of Forensic Studies, Minneapolis, Minnesota.

**Kostas A. Katsavdakis, Ph.D., ABPP**
**Page 6 of 12**

Katsavdakis, K.A. (October, 2017). A Discussion of Sex Offender Evaluation and Risk Assessment (Panelist). Sex Offender Management and Treatment Act: Joint Training Conference, Saratoga Springs, N.Y.

Katsavdakis, K.A. (September, 2017).  Advanced Threat Assessment and Management. American Academy of Forensic Psychology, Tampa, Florida.

Katsavdakis, K.A. (April, 2017).  Advanced Threat Assessment and Management. American Academy of Forensic Psychology, Chicago, Illinois.

Katsavdakis, K.A. (October, 2016).  Advanced Threat Assessment and Management. American Academy of Forensic Psychology, Atlanta, Georgia.

Katsavdakis, K.A. (October, 2016).  Threat and Risk Assessment and Management: K-12 Settings. Mt. Olive School District, New Jersey.

Katsavdakis, K.A. (November, 2015).  Advanced Threat Assessment and Management. American Academy of Forensic Psychology, Alexandria, Virginia.

Katsavdakis, K.A. (February, 2015).  An Introduction to Threat Assessment and Management. The Association of Student Assistant Professionals of New Jersey, 29th Annual Conference.  Atlantic City, New Jersey.

Katsavdakis, K.A. (October, 2014).  Advanced Threat Assessment and Management. American Academy of Forensic Psychology, Scottsdale, Arizona.

Katsavdakis, K.A. (April, 2014). Highlights of Changes from DSM-IV-TR to DSM-5: An Effort to Unmuddy the Diagnostic Waters. The Mental Hygiene Legal Service, Second Department's Continuing Legal Education Program. New York State Judicial Institute, White Plains, New York.

Katsavdakis, K.A. (March, 2014). Threat and Risk Assessment and Management: Connecting the Dots, Strategic Interventions for the Prevention of Violence in School Settings. Mt. Olive School District, New Jersey.

Katsavdakis, K.A. (September, 2013). Threat and Risk Assessment and Management of Children and Young Adults: Connecting the Dots for Violence Prevention in School Settings and Communities.  Diedre's House, Morristown, New Jersey.

Katsavdakis, K.A. (2011, March 2011).  Static-99R Update for Civil Commitment Proceedings; New York State. Sponsored by Mental Hygiene Legal Services, 2nd Department, New York, NY.

Katsavdakis, K.A. (2007, July).  Sexual Offender Management and Treatment Act of 2007; New York State. Sponsored by the New York State Defenders Association. Saratoga Springs, NY.

Katsavdakis, K.A. (2007, June).  Sexual Offender Management and Treatment Act of 2007; New York State.. Sponsored by the New York State Association for Criminal Defense Lawyers. Poughkeepsie, NY.

Katsavdakis, K.A. (2007, May).  Sexual Offender Management and Treatment Act of 2007; New York State.. Sponsored by the New York State Association for Criminal Defense Lawyers. Binghamton, NY.

Katsavdakis, K.A. (2007, April).  Sexual Offender Management and Treatment Act of 2007; New York State.. Sponsored by the New York State Defender's Association, Rochester, NY.

**Kostas A. Katsavdakis, Ph.D., ABPP**
**Page 7 of 12**

Katsavdakis, K.A. (2007, February).  Dealing with Difficult Clients. Sponsored by Queens County Bar Association, Queens, NY.

Katsavdakis, K.A. (2006, December).  Cross-Examination of the Forensic Expert: Collaborative Strategies. Sponsored by Nassau County District Attorney's Office, Nassau County, NY.

Katsavdakis, K.A. (2006, February).  Cross-Examination of the Prosecution or Defense Forensic Expert: Collaborative Strategies. Sponsored by Queens County Bar Association, Queens, NY.

Katsavdakis, K.A. (2005, October).  Preparing the Forensic Expert in Sex Crime Cases: What You Need to Know.  Sponsored by the New York State Association of Criminal Defense Lawyers

Katsavdakis, K.A. (2005, April). Sexual Offender Risk Assessment. Grand Rounds, Sponsored by Cabrini Medical Center - New York City, NY.

Katsavdakis, K.A. (2005, April). The Law, "Doe v. Pataki Rehearings, and Expert Input on Risk Assessment. Presentation sponsored by Appellate Division, First Judicial Department -  New York City, NY.

Katsavdakis, K.A. (2005, January). Preparing the Defense Expert: What You Need to Know.  Part of an Advanced Criminal Law Seminar, "The Defense of a Sex Crimes Case," Sponsored by the New York State Association of Criminal Defense Lawyers – New York City, NY.

Katsavdakis, K.A. (2004, October). Sexual Offender Risk Assessment. Presentation at Legal Aid Society, Criminal Appeals Bureau – New York City, NY

Katsavdakis, K.A. (2004, October). The Use Benefiting from the Use of Forensic Psychology Experts, Reports and Testimony. Presentation at Queens County Bar Association: Advanced Law Series, Queens, NY

Katsavdakis, K.A. (2004, September). Forensic Psychology and the Defense of a Criminal Case.  Presentation at Kings County Criminal Bar Association, Brooklyn, New York, NY.

Katsavdakis, K.A., Schaich, D., & Langer, S. (2004, February). How To Provide a Comprehensive Sexual Offender Program in Civil and Forensic Psychiatric Centers. American Academy of Forensic Sciences, 56th Annual Meeting, Dallas, Texas.

Katsavdakis, K.A. (2004, January). The Forensic Risk Assessment of Sexual Offenders. Grand Rounds Presentation at Beth Israel Medical Center, New York, NY.

Schaich, D., & Katsavdakis, K.A. (2003, November). Sexual Treatment Offender Program.  Part of Day-Long Conference on Treating Violence: Evidence Based Practices for the Most Challenging Patients, New York University, New York, NY.

Katsavdakis, K.A. (2003, October). Evaluating Risk in Sex Offenders. 2 Week Presentation to New York University-Bellevue Psychology Internship Program, Bellevue Hospital-New York University, New York, NY.

Katsavdakis, K.A., Schaich, D. & Mortiere, C. (2003, May). The Assessment and Treatment of Sexual Offenders. 2-Day Presentation at Kirby Forensic Psychiatric Center and Manhattan Psychiatric Center, New York, NY.

Katsavdakis, K.A. (2003, April). The Assessment of Sexual Offenders.  3-Week Presentation to New York University, 3rd Year Psychiatry Residents, Manhattan Psychiatric Center, New York, NY.

Katsavdakis, K.A. (2003, March). The Assessment of Psychopathy in Impaired Health Professionals.  Continuing Education presented to Columbia Presbyterian Hospital – Forensic Psychiatry Fellows, New York, NY.

**Kostas A. Katsavdakis, Ph.D., ABPP**
**Page 8 of 12**

Katsavdakis, K.A. (2003, March). <u>The American Psychological Association Ethics Code, 2001: Relevance to Forensic Psychology.</u> Continuing Education presented to Kirby Forensic Psychiatric Center, New York, NY.

Katsavdakis, K.A. (2002, November). <u>The Ethics of Informed Consent at the Turn of the Century.</u> Continuing Education presented to Two Rivers Psychiatric Hospital, Kansas City, MO.

Katsavdakis, K.A. (2002, October). <u>Evaluation and Risk Assessment for Pedophilia.</u> Continuing Education presented to Shawnee County Court, Topeka, KS.

Katsavdakis, K.A. (2002, September). <u>Evaluation and Risk Assessment for Pedophilia.</u> Continuing Education presented to Stormont Vail Hospital Grand Rounds, Topeka, KS.

Katsavdakis, K.A. (2002, May). <u>The Ethics of Informed Consent and Confidentiality in the 21st Century.</u> Continuing Education presented to Family Service and Guidance Center, Topeka, KS.

Katsavdakis, K.A. & Athey, G.A. (2002, April). <u>The Use and Misuse of Forensic Psychological Evaluations.</u> Continuing Law Education presented to Topeka Bar Association, Topeka, KS.

Katsavdakis, K.A. (2002, April). <u>Confidentiality and Maintaining Therapeutic Boundaries.</u> Continuing Education presented to Family Service and Guidance Center, Topeka, KS.

Katsavdakis, K.A. (2000, November). <u>The Ethics of Informed Consent and Confidentiality at the Turn of the Century.</u> Continuing Education presented to the Psychology Discipline at the Menninger Clinic, Topeka, KS.

Katsavdakis, K.A. (2000, September). <u>Assessment of Psychopathy.</u> Continuing Education presented to the Psychology Discipline at the Menninger Clinic, Topeka, KS.

Katsavdakis, K.A. (2000, August). <u>Sexual Offenders: Assessment, Treatment and Legal Issues.</u> Education presented to the 2nd and 3rd year Psychiatric Residents at the Karl Menninger School of Psychiatry at the Menninger Clinic, Topeka, KS.

Katsavdakis, K., Sayed, M., Bram, A., & Bartlett, A. (2000, May). <u>How was this Story Told in the Mother Tongue? An Integrative Perspective.</u> Conference of the American Psychoanalytic Association, Chicago, IL.

Katsavdakis, K.A. (1999, February). <u>The Treatment of a Sexual Perversion in a Middle-Aged Man.</u> Continuing Education at the Menninger Clinic, Topeka, KS.

Katsavdakis, K.A. (1996, June). <u>On Paternal Nurturance</u>. Presentation at the 21st Conference on Men and Masculinity, Portland, OR.

Katsavdakis, K.A. (1995, December). <u>Paternal nurturance as a function of the current relationship between adult-son and father</u>. Presentation at the Fall Meeting of the American Psychoanalytic Association, New York City, NY.

**Continuing Education**

Case Law: Competence to Stand Trial and Criminal Responsibility, June 6th, 2019, Presented by Robert Cochrane, PsyD, APP, and sponsored by the American Academy of Forensic Psychology, Burlington, VT, 7 Hours/Credits.

The Assessment of Risk and Threat in Stalking Cases, May 10th, 2019, Presented by Kostas A. Katsavdakis, PhD, ABPP, and sponsored by the American Institute for Advancement of Forensic Studies, Minneapolis, MN, 6 Credits.

**Kostas A. Katsavdakis, Ph.D., ABPP**
**Page 9 of 12**

Advanced Threat Assessment and Management, April 6th, 2018, Presented by Kostas. A. Katsavdakis, PhD, ABPP, and sponsored by the American Academy of Forensic Psychology, New Orleans, LA 7 Hours/Credits.

Critical Thinking in Forensic Psychological Evaluation, September 7th, 2017, Presented by Terry Kukor, PhD, ABPP, and sponsored by the American Academy of Forensic Psychology, Tampa, FL, 7 Hours/Credits.

Evidence Based Evaluations of Criminal Responsibility, April 19th, 2017, Presented by Terry Kukor, PhD, ABPP, and sponsored by the American Academy of Forensic Psychology, Chicago, IL, 7 Hours/Credits.

Campus and School Violence Threat Management, February 25th, 2016. Presented by Kris Mohandie, PhD, ABPP and Sponsored by the American Academy of Forensic Psychology, New Orleans, LA, 7 Hours/Credits.

The Roles and Responsibilities of a Psychologist in a Crisis/Hostage Situations, February 24th, 2016. Presented by Scott V. Allen, PhD, ABPP and Sponsored by the American Academy of Forensic Psychology, New Orleans, LA, 7 Hours/Credits.

Assessing and Managing Violence Risk, November 7th, 2015. Presented by Mary Alice Conroy, PhD, ABPP and Sponsored by the American Academy of Forensic Psychology, Alexandria, VA, 7 Hours/Credits.

Admissibility of Psychological Evidence and Expert Opinions: Challenges and Dilemmas, October 17th 2014. Presented by Paul M. Kaufman, JD, PhD, ABPP and Sponsored by the American Academy of Forensic Psychology, Scottsdale, Arizona, 7 Hours/Credits.

Evidence and Testimony for Forensic Psychologists, June 7th 2014. Presented by Tim Tippins, JD and Sponsored by the American Academy of Forensic Psychology, Philadelphia, Pennsylvania 7 Hours/Credits.

Confessions of a Jury Consultant: An Insider's View to Effective Communication Skills, June 6th 2014. Presented by Daniel Wolf, JD, PhD and Sponsored by the American Academy of Forensic Psychology, Philadelphia, Pennsylvania, 7 Hours/Credits.

Forensic Psychology Oral Examination, October 25th 2013, Sponsored by American Board of Professional Psychology, 10 Hours/Credits.

Advances in Violence Risk Assessment: Introduction and Application of the HCR-20 Version 3, June 13 – 14, 2013, Stephen D. Hart, PhD & Kevin S. Douglas, PhD Fordham University School of Law, 12 Hours/Credits

Mental Disorder, Violence, and Coercion, September 7th, 2012, Presented by John Monahan, PhD, and Sponsored by the American Academy of Forensic Psychology, San Francisco, California, 7 Hours/Credits.

Risk Assessment and Management in Probation and Parole, September 6th, 2012, Jennifer Skeem, PhD, and Sponsored by the American Academy of Forensic Psychology, San Francisco, California, 7 Hours/Credits.

Assessing Psychopathy with the Psychopathy Checklist-Revised (PCL-R),  June 22nd and 23rd,  2012. Presented by J. Reid Meloy, PhD, ABPP, and sponsored by Specialized Training Services, Baltimore, Maryland, 14 Hours/Credits.

Insanity Defense Evaluations, April 20th, 2011, Presented by Philip Resnick, MD, and Sponsored by the American Academy of Forensic Psychology, Chicago, Illinois 7 Hours/Credits.

Kostas A. Katsavdakis, Ph.D., ABPP
Page 10 of 12

Public and Private Stalking: State of the Science, Presented by J. Reid Meloy, PhD, ABPP, and Sponsored by the Association of Threat Assessment Professionals, Chicago, Illinois.

Case Law Update, December 10th, 2010, Presented by Terese A. Hall, JD, PhD, ABPP, and Sponsored by American Academy of Forensic Psychology, Philadelphia, Pennsylvania, 7 Hours/Credits.

Developments in Risk Assessment: Violence Risk and Sexual Violence Risk, December 9th, 2010, Presented by Kirk Heilbrun, PhD, ABPP and Sponsored by American Academy of Forensic Psychology, Philadelphia, Pennsylvania, 7 Hours/Credits.

Sex Offender Assessment, June 12th, 2010, Presented by Philip Witt, PhD, ABPP and Sponsored by American Academy of Forensic Psychology, San Juan, Puerto Rico, 7 Hours/Credits.

The Defendant: Impact of Mental Disability in the Criminal Law Process, September 25th, 2009, Presented by Michael Perlin, JD, and Sponsored by American Academy of Forensic Psychology, Sarasota, Florida, 7 Hours/Credits.

Ethics in Forensic Practice, September 24th, 2009, Presented by Gerry Koocher, PhD, and Sponsored by American Academy of Forensic Psychology, Sarasota, Florida, 7 Hours/Credits.

Stalking: The State of Science, March 28th, 2009, Presented by J. Reid Meloy, PhD, ABPP, and Sponsored by American Academy of Forensic Psychology, Montreal, Canada, 7 Hours/Credits.

The MMPI-2-RF (Restructured Form): An Introduction for Forensic Psychologists, March 27th, 2009, Presented by Yossef S. Ben-Porath, PhD, and Sponsored by American Academy of Forensic Psychology, Montreal, Canada, 7 Hours/Credits.

Assessing Psychopathy with the Psychopathy Checklist-Revised (PCL-R), August 23 and 24, 2008. Presented by J. Reid Meloy, PhD, ABPP, and sponsored by Specialized Training Services, San Diego, California, 14 Hours/Credits

Excusing and the New Excuses, October 26, 2007, Presented by Stephen Morse, JD, PhD, ABPP, and sponsored by American Academy of Forensic Psychology, St. Louis, Missouri, 7 Hours/Credits.

Psycho-Legal Issues in Criminal Cases, October 25, 2007, Presented by Christopher Slobogin, JD, LLM, and sponsored by American Academy of Forensic Psychology, St. Louis, Missouri, 7 Hours/Credits.

Violence Risk and Threat Assessment, March 8th – 9th 2007, Presented by Reid Meloy, PhD, ABPP, and Sponsored by Specialized Training Services, Manchester – New Hampshire, 14 Hours/Credits

Testifying in Court, March 6th – 7th, 2007, Presented by Stanley Brodsky, PhD, and sponsored by Specialized Training Services, Manchester – New Hampshire, 14 Hours/Credits

Use of the Personality Assessment Inventory in Forensic & Correctional Settings, October 14, 2006, Presented by John Edens, PhD, and sponsored by American Academy of Forensic Psychology, 7 Hours/Credits.

When Parents Kill: Neonaticide, Infanticide & Filicide, October 13, 2006, Presented by Geoffrey R. McKee, PhD, ABPP, and sponsored by American Academy of Forensic Psychology, 7 Hours/Credits.

Ethical Issues for the Forensic Practioner, October 12, 2006, Presented by Donald Bersoff, PhD, JD, and sponsored by American Academy of Forensic Psychology, 7 Hours/Credits.

Advanced Topics in Expert Testimony: The Presentation, September 23, 2005, Presented by Randy Otto, PhD, ABPP, and Stuart Greenberg, PhD, ABPP, and sponsored by American Academy of Forensic Psychology, 7 Hours/Credits.

**Kostas A. Katsavdakis, Ph.D., ABPP**
**Page 11 of 12**

Advanced Topics in Expert Testimony: The Evidence, September 22, 2005, Presented by Randy Otto, PhD, ABPP, and Stuart Greenberg, PhD, ABPP, and sponsored by American Academy of Forensic Psychology, 7 Hours/Credits.

Threat Assessment: A Practical Approach to Prevent Targeted Violence, September 21, 2005, Presented by Harley V. Stock, PhD, ABPP, and sponsored by American Academy of Forensic Psychology, 7 Hours/Credits.

The Role of the Forensic Psychologist in Death Penalty Litigation, March 6, 2005, Presented by Mark D. Cunningham, PhD, ABPP, and sponsored by American Academy of Forensic Psychology, 7 Hours/Credits.

Handling Cross-Examination: Maintaining Credibility, Handling Attacks, and Answering the Critics, March 5, 2005, Presented by Diane R. Follingstad, PhD, ABPP, and sponsored by American Academy of Forensic Psychology, 7 Hours/Credits.

Developmental Pathways to Severe Antisocial and Aggressive Behavior, March 4 2005, Presented by Paul J. Frick, PhD, and sponsored by American Academy of Forensic Psychology, 7 Hours/Credits.

Violence Risk Assessment and Management Using Structured Professional Judgment, October 2, 2004, Presented by Kevin Douglas, LL.B., PhD, and sponsored by American Academy of Forensic Psychology, 7 Hours/Credits.

Legal Research Techniques, October 1, 2004, Presented by Alexander Greer, PhD, JD, and sponsored by the American Academy of Forensic Psychology, 7 Hours/Credits.

Clinical Supervision Skills in Behavioral Health: Ethical and Best Practices Issues, May 5th, 2004, Sponsored by Cross County University, Paramus, New Jersey, 6 Hours/Credits.

Assessing Response Style in the Context of Forensic Evaluation, March 10th, 2004, Presented by Randy Otto and Sponsored by Society for Personality Assessment, Miami, Florida, 7 Hours/Credits

Using the MMP1–2 with Criminal Offenders, March 10th, 2004, Sponsored by Society for Personality Assessment, Miami, Florida, 3.5 Hours/Credits

Beyond Risk Management: Resolving Ethical Dilemmas in Clinical and Personality Assessment Under the 2002 Ethics Code and the HIPAA Privacy Rule, March 11th, 2004. Sponsored by Society for Personality Assessment, Miami, Florida, 4 Hours/Credits

Advanced Forensic Psychology Practice: Issues and Applications, October 23rd – 25th, 2003, Sponsored by the American Academy of Forensic Psychology, Denver, Colorado, 24 Hours/Credits

Diplomate Preparation Workshop, October 26th, 2003, Presented by Alan Goldstein, PhD, ABPP, and Sponsored by the American Academy of Forensic Psychology, Denver, Colorado, 6 Hours/Credits

Assessing Risk of Juvenile Violence, April 28th and 29th, 2003, Presented by Randy Borum, PsyD, ABPP, and Sponsored by Specialized Training Services, Manchester, New Hampshire, 14 Hours/Credits

Personal Injury Examinations, February 23, 2003, Presented by Stuart Greenberg, PhD, ABPP, and sponsored by the American Academy of Forensic Psychology, Charleston - South Carolina, 7 CE Hours/Credits

Psychological Issues in Criminal Cases, February 22, 2003, Presented by Michael Perlin, JD and sponsored by the American Academy of Forensic Psychology, Charleston - South Carolina, 7 CE Hours/Credits

Assessing Juvenile Violent Offenders, February 21, 2003, Presented by Thomas Grisso, PhD, ABPP, and Sponsored by the American Academy of Forensic Psychology, Charleston - South Carolina, 7 CE

**Kostas A. Katsavdakis, Ph.D., ABPP**
**Page 12 of 12**
Hours/Credits

The Sexually Violent Offender, December 5th – 6th, 2002, Presented by Roy Hazelwood, MS and sponsored by Specialized Training Services, Baltimore – Maryland, 14 Hours/Credits

Sex Offenders; New Methods of Evaluation and Treatment, December 3rd – 4th, 2002, Presented by Anna Salter, PhD and sponsored by Specialized Training Services, Baltimore – Maryland, 14 Hours/Credits

Current Controversies in Forensic Psychology, October 25, 2002, Presented by David Shapiro, PhD, ABPP, and sponsored by the American Academy of Forensic Psychology, Kansas City – Missouri, 7 CE Hours/Credits

Ethical Issues for the Forensic Practitioner, October 24, 2002, Presented by Donald Bersoff, JD, PhD and sponsored by the American Academy of Forensic Psychology, Kansas City – Missouri, 7 CE Hours/Credits

Violence Risk and Threat Assessment, June 20th – 21st, 2002, Presented by Reid Meloy, PhD, ABPP, and Sponsored by Specialized Training Services, Manchester – New Hampshire, 14 Hours/Credits

Testifying in Court, June 18th – 19th, 2002, Presented by Stanley Brodsky, PhD, and sponsored by Specialized Training Services, Manchester – New Hampshire, 14 Hours/Credits

Comprehensive Examination of Malingering in Forensic Settings, February 9, 2002, Presented by Richard Frederick, PhD, ABPP, and sponsored by the American Academy of Forensic Psychology, San Diego – California, 7 CE Hours/Credits

Psychological Issues in Criminal Cases, February 8, 2002, Presented by Christopher Slobogin, JD and sponsored by the American Academy of Forensic Psychology, San Diego – California, 7 CE Hours/Credits

Evaluating Parenting Capacity and Allegations of Child Maltreatment, February 7, 2002, Presented by Lois B. Oberlander, PhD, ABPP, and sponsored by the American Academy of Forensic Psychology, San Diego – California, 7 CE Hours/Credits

Assessing Psychopathy: Using the PCL-R/SV, June 20th – 21st, 2000, Presented by Robert Hare, PhD and Adelle Forth, PhD, Kansas City – Missouri, 14 CE Hours/Credits

# EXHIBIT C

**[REDACTED]**

# EXHIBIT D

Honorable Naomi Reice Buchwald
United States District Judge
Southern District of New York

April 19, 2021

Dear Judge Buchwald:

I am Brandy Jimenez, Zachary Clark's partner of 4 years. I'd like to begin by saying, I do not and have never shared or supported any of the views or beliefs that landed Zachary in jail. I feel very strongly against anything that advocates violence and a division of people based off of religion, race, color, creed or social status. I would never allow this around my children or myself, and Zachary has never spoken of these things to us. Nor does he hold these beliefs any longer.

In the time that I have known Zachary, he has been a very loving and kind soul. He has consistently shown me his values on the importance of family and togetherness. He made sure to always create moments and opportunities for us as a family to interact and grow closer, especially in a world now driven apart by social media. Be it something as simple as cooking and making sure we sat down to dinner as a family or setting days that were for outings, Zachary provided experiences new to us. He took on the daunting task of being a father to 3 children who are not biologically his and a father to our 3-year-old son. For a while my older children struggled with the hurt from not having their dad around and Zachary quickly and selflessly provided them with the love and support they lacked. For that they adore him, as do I.

Zachary and I have always shared an affinity and love for the simplicities in life, such as books, nature, vegan food and being surrounded by the beauty in the differences of people. I have always loved his gentle nature and open-mindedness.

It is no secret that Zachary lived through a very abusive and traumatic childhood, from broken bones and watching his mother being abused, to constantly being subjected to mental and verbal abuse himself. He grew up witnessing his parents abuse drugs, and his father was a very heavy drinker. This introduced Zachary to a world of addiction at a very young age. He started using drugs himself as a teen. He has been fighting this addiction for the last 26 years of his life, always torn between the guilt and self-loathing from using and trying to achieve something far better than what he knew as a child.

Because of Zachary's battle with addiction, it isn't a wonder to me that he found appeal in an organization that is vehemently against narcotics and alcohol, opposite of anything he knew growing up. It does not make the choices he made any less wrong. I know him very well and believe that he was never in a war against our country, instead he was in a war against himself. He is full of regret and deep remorse everyday. For the choices he made, for going against who he really is by nature, and for the difficulty and sadness this has caused for our children and myself.

His time away has felt like an eternity. With COVID running rampant, it has made communication difficult, though we correspond through mail daily. I have not seen my partner in over a year. Most of the time he has been in a cell for 24 hours of the day. I know this is for his own safety but it is difficult nonetheless. Regardless, Zachary still uses what time he does have to try to continue to be an integral part of this family. He has made many changes in his time away. Despite the weight of sadness, he is trying to remain pro-active in bettering himself. He has joined a drug program and is doing well in it. He

has many plans for when he comes home and often talks about getting a job and being a good provider so that we could do more things with the children. He talks about enrolling into college and just being here in general to continue being the loving father he is.

I understand Zachary will face serious consequences for his actions. I will be here to support him through the coming years and beyond, as he has been a loving and integral part of our family and will continue to be. Thank you so much for your time.

Sincerely,

Brandy Jimenez

Honorable Naomi Reice Buchwald
United States District Judge
Southern District of New York


February 20, 2021


Dear Judge Buchwald:


I am Zachary's partner's mother, Brenda Rodriguez. Zachary lived with my daughter, Brandy Jimenez, her children, and myself for about a year and half in the Bronx before I moved out and left them to live their lives privately. While I lived with them, I got to know Zach pretty well. I know that he struggled with addiction on and off, and it has marked much of his life. At the same time, he was always loving towards me and the rest of the family. He was always willing to help with house work, errands, or just be there to listen to me talk about a hard day's work, or life's disappointments.

I remember clearly one instance, it was maybe 6am and I was asleep in bed when all of a sudden water starts raining down on me in bed. The upstairs apartment had flooded. I jumped out of bed and ran to get my daughter and Zach, and he jumped into action. He went to get the building's superintendent to come take care of the situation and then came back to help with the clean up and bailing of water which took hours. Zach wasn't just helpful, he was kind about it and never complained. He would even help my mother, 84 years old, in her own apartment when she needed help. He would go over to her place and wax her floors, mine too, run errands for her or with her. He has a huge kind heart and a pleasant disposition.

I have spoken to Zach by phone since his incarceration, so I know all about what he's going through and some of how he is feeling through many conversations with my daughter. She and I are very close, and speak every single day.  I know he is missing his children and I know that he is remorseful. He is missing out on the growth of his kids, their daily accomplishments. That has to be weighing heavily on him. I also understand that he is seeking help in the form of a program or counseling for preventing addiction in the future, so that he doesn't return to that lifestyle.  I wish I could say I knew what his childhood was like, but the truth is I only know it was rough.

We love Zach. My daughter, my grandkids, myself and those who came in contact with him always had kind words about Zach. I can tell you that it is heartbreaking watching his three year old ask for his Dada, and his other kids who understand what incarceration is, they miss him terribly. They bonded very well even if he isn't their biological father. My three older grandchildren really have strong feelings for Zach. My daughter is managing four children on her own. Although I try to help as much and as often as I possibly can, I cannot replace the love she feels for Zachary, nor the void his absence has left in her life. She also struggles with illness and Zach was there to make sure nothing happened to her, take her to the doctors, take her to run errands, and generally really just taking care of her.

Zachary has a close knit family to come home to, with plenty of adults that do not ever participate in drug use and who genuinely want to see him succeed. He is a good father and partner to my daughter and we will support him to do right by his kids, help him get on his feet,

and stay that way. I know he is full of regrets, and that being incarcerated has been one of the most difficult challenges of his life.

I ask that you consider Zachary's difficult background and the strong ties he has to his family as you consider his sentence. Suffice it to say that Zach will not be without a good strong support system and that he will not be lacking in people who care about him and will hold him up and hold him accountable for getting back to the business of living a clean wholesome life upon his return to his family.

I can be reached at: ████████████ should you have additional questions.


Sincerely,

Brenda Rodriguez

Dear Judge Buchwald,

Hello, my name is ███████████ and I am 15 years old. Zachary Clark is my stepfather but I look up to him as my real father because he has been the only real father figure in my life, more than my biological father. He has been with my mother for 4 years now. He is an amazing Dad. He is caring, funny, loving and selfless. He came into our lives and taught us the importance of family. He picked us up from school, made sure we got home safely. The times we came on our own, he always greeted us with a smile and made us feel that he was happy to see us.

He taught us the importance of appreciating the world around us and to not let life pass us by with our faces in our phones. He made sure we took pride in our school work and made a point to make sure we did things as a family. We went to the pool, parks, libraries and movies. The one thing that will stay with me forever is that since he was in my life, I had a dad to take me to the daddy and daughter dances. I used to feel left out before. He boosted my confidence and made us all feel so loved.

It makes me sad that he is in prison and not here to be apart of birthdays and family events. I used to visit him in jail but Covid ruined that and made it hard to even talk by phone, because most of the time he was on lockdown for 24 hours a day. I know he's sad too because I can tell by his face when we have video visits. He tells us all the time how he is sorry and that he should've never made poor choices. I believe with all my heart he means that.

I know he can and will do better when he's home and even in jail he's working to be a more positive person. I miss him very much and feel safer when he was with us. Our family does not feel the same without him. He's a good person who had a hard time. I know he's learned his lesson. When he gets home he plans to work and take us on new family adventures so we can do the things we didn't get to do.

Sincerely,

███████████

Dear Judge Buchwald,

My name is ███████, I am 17 years old. Zachary Clark is my father. Although not biologically, he has done more for me in my 17 years than my real father ever has. He is very kind and loving and has been a huge emotional support system in my siblings lives and myself.

He has been there to help me through day to day issues and to help coach me through the stresses of high school and life in general. He has always treated me as his own and made our family feel more like a family, by instilling his own family values. He always made sure that we sat down to dinner together. He made sure we had game nights and that we did things together outdoors as a family. It's hard to name just a few instances, because truly it is his presence in my daily life that has made all the differences for the better.

I know that he regrets the decisions he's made that landed him in jail and if he could take it all back he would. His time away has been really difficult on both of us in addition to the rest of our family. It is overwhelmingly sad not being able to talk to him when I need to, not being able to visit him in person and having to watch my 2 year old brother ask where his daddy is. I know that it breaks his heart not being able to be a dad the way he wants and needs to be. I worry about his mental and emotional health as well. I worry because he's struggled in the past with childhood abuse and drug addiction and I feel like we motivated him to do better, because we are all he has.

The father I know would never cause harm to anyone. He's made mistakes, but I know that inside he is a great person who tried and is still trying to be a better person. I know that if he was home he would do things differently and make sure that he works and is productive. I know that he would use his time home when he does come back home to improve himself, because that is the lesson he would want to teach us. That when given the opportunity, do not ever take it for granted.

Sincerely,

████████

# EXHIBIT E

K71HARAS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                    v.                      20 Cr. 19 (PAE)

JUAN CARLOS ARACENA DE JESUS,

                                            Sentence
                    Defendant.

------------------------------x

                                            New York, N.Y.
                                            July 1, 2020
                                            11:15 a.m.

Before:

                    HON. PAUL A. ENGELMAYER,

                                            District Judge

                        APPEARANCES

AUDREY STRAUSS
        Acting United States Attorney for the
        Southern District of New York
KAYLAN LASKY
        Assistant United States Attorney

DAVID E. PATTON
        Federal Defenders of New York, Inc.
        Attorney for the Defendant
ROBERT A. BAUM

Also Present:  Mirta Hess Loedel, Interpreter (Spanish)

K71HARAS

1   your return, your daughter got back on track, and she is now in

2   college.  All that says to me that while you are a felon

3   multiple times over, you are also in other ways a devoted and

4   apparently beloved father.  People are complicated.  I see that

5   in cases all the time, and this case provides an unusually good

6   example.  On the day that a person is sentenced, it's

7   appropriate that they be considered in light of the totality of

8   their life's experience, the good as well as the bad, and I

9   will do so today.

10          Finally, I am mindful, as I said earlier, that you

11   have served most of your time in prison so far during the worst

12   pandemic in this country during the past 100 years.  I'm

13   mindful that you may have contracted COVID-19 while in prison.

14   I'm mindful that your experience in prison as a result of the

15   pandemic, the preceding lockdown, the ensuing lockdown, and

16   your own illness was frightful.  Prison is supposed to be

17   punishment, but it is not supposed to be trauma of that nature

18   or close.  My colleagues and I commonly informally credit

19   prisoners who have served time awaiting extradition in dreadful

20   prisons overseas with more time served than measured by the

21   calendar.  The same logic applies here, and then some.

22          Your time in the MCC was way harder than anyone

23   intended when you were detained following your arrest.  When

24   you and I first met at the initial conference in this case, I

25   had no way to predict that the time you would be spending, in

K71HARAS

effect under the supervision of me, would be spent under the

horrific conditions under which you came to spend them.  That's

not anybody's fault.  It's the way pandemics work in the

confined context of a prison, but it is certainly the way you

experienced it.

        Bottom line, your time in the MCC was way harder than

anyone intended when you were detained following your arrest.

Any mature system of justice, any thoughtful judge in imposing

the reasonable sentence here would have to recognize the

unexpected and regrettable ardors that you experienced since

your arrest in December.  And upon the end of your prison

sentence, you will enter immigration detention in which I

expect you will likewise be subject to unexpected restraints on

movement and perhaps risk of contagion given the continuing

pandemic.  That consequence is also relevant to the just

sentence.

        Now, the guidelines here recommend a sentence of 30 to

37 months' imprisonment.  The probation department and the

government recommend a sentence, a guideline sentence.  I don't

say this often, but I regard that recommendation as reflexive

and regrettable.  Given the hard nature of the time -- I

usually very often do not impose a guideline sentence, but in

this case I'm going a little bit beyond that to say that I was

sorry to receive the government's recommendation of a guideline

sentence.  I expected better.  Given the hard nature of the

K71HARAS

time Mr. De Jesus has served in the MCC during the coronavirus

pandemic in particular but also not irrelevant given the

impetus for his return, this is as clear a case as I've seen in

a long time crying out for a downward variance materially below

the guideline for illegal reentry.  I will impose a sentence

that reflects a substantially downward variance.

A guideline behavior is not simply, as in some cases,

one of the reasonable sentences and just merely not the lowest

one.  This is a case in which a guideline sentence would be

affirmatively unreasonable here in my judgment, and various

sentences below the guidelines here are clearly reasonable.

Given the parsimony principle requiring the Court to impose the

lowest reasonable sentence, a materially below guidelines

sentence is in order here.

I've carefully considered whether the sentence of time

served that Mr. Baum has requested is justified here.  My

judgment, for the reasons I've covered, is that with a very

small caveat such a sentence is reasonable.  Under the unique

circumstances here, the time Mr. De Jesus has served and the

conditions he has served them also qualifies as just punishment

and one that is sufficient to deter him and others and to

adequately protect the public.  I'm reinforced in that judgment

by the unique factors that gave rise to the illegal reentry

here.  It is appropriate to reflect his history and

characteristics.

# EXHIBIT F

Dear Judge Buchwald:

I want to make clear that I do not support the ideals and actions of the Islamic state. I feel guilty for the things I posted and for the impact they could have had on others. I knew at the time that I would never harm another person, but I did not know what others were capable of, and how the things I posted might have impacted them. I am sorry for what I did.

I am not a "threat." I am a human, that is all. My story is pretty basic when it all boils down to it. Probation, parole, mom, jail, prison, currently under federal holding and so on in just that order. I have a long history battling both addiction and mental health. For some it may be worse or harder, for some an obstacle or a "phase," and then there's the ones debilitated and crippled by it. I am the latter. Combined with losing people, PSTD, and parenting, I have to be honest it's been an uphill struggle and I am lucky and blessed enough to still be alive, 3 overdoses later. My lack of family and not having any positive people to look to led me to despair and longing, recklessness, hatefulness, and so I didn't often care where the love and sense of belonging came from, which led me to some very bad examples and even worse teachers throughout my life. And now here I sit in jail worrying about the example I've shown my children and will I get home in time to still be a Dad and be needed by them. No matter how you stack it, life moves on, people grow, and people change. I myself have really used my incarceration time, as rough as it has absolutely been to reflect, to learn, to "grow up" at 42 years of age today, right now! As I sit here writing this on my birthday I have realized life is so precious and valuable and how I let it go so unnoticed and unappreciated. This is being sorted out now with the help of therapy and counseling. One thing is for sure, I will never take advantage of or show or feel any more disregard for this life again, nor will I follow "leaders" and "brothers" that try to use religion as a means of destruction rather than uplifting people.

When I eventually go home I am going to be very careful who I surround myself with. I want to participate in substance abuse treatment and more therapy and counseling. I know I need to stay clean and take my mental health medications. I want to find a good job and be a good father and husband. I also want to work with youth to help them avoid my mistakes. I am determined to do these things.

Thank you for reading this letter.

Zachary Clark

# EXHIBIT G



## ST. JOHN'S
## RIVERSIDE
## HOSPITAL

**Criminal Justice Services**
**Solutions / Resolve to Stop the Violence Project (RSVP)**
Westchester County Department of Correction

February 23, 2021

Ms. Alondra Reyes, Esq.           Re: Zachary Clark
52 Duane Street-10th Floor        DOB # 04/21/79
New York, New York 10604

Ms. Reyes,

Please be advised that Zachary Clark is involved in the Solutions Program, an alcoholism/substance abuse program, located in the Westchester County Dept. of Corrections facility, Valhalla N.Y. He entered the program on January 13, 21.

He is engaged in "Cognitive Behavioral Interventions for Substance Abuse-Adult (CBI-SA) groups, individual sessions, and in all program activities.

It is our recommendation that upon release to the community Mr. Zachary Clark
continue substance abuse treatment at:

**South Richmond Recovery Outpatient Program located at 88-08 Liberty Ave. Ozone Park, NY 11417.**

If further information is required, please feel free to contact me at (914) 231-1317.

Sincerely

*Pamela Spencer, CASAC*

Pamela Spencer, AA, CASAC
Clinical Supervisor Solutions

**P.O. Box 389 * Valhalla, New York 10595* Tel: (914) 231- 1317   Fax: (914) 231-1413**
**RiversideHealth.org     (914) 964-4444**
967 North Broadway, Yonkers, NY 10701    2 Park Avenue, Yonkers, NY 10703    28 Ashford Avenue, Dobbs Ferry, NY 10522