UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

      -v.-

ZACHARY CLARK,
     a/k/a "Umar Kabir,"
     a/k/a "Umar Shishani,"
     a/k/a "Abu Talha,"

               Defendant.

20 Cr. 76 (NRB)

## THE GOVERNMENT'S SENTENCING MEMORANDUM

AUDREY STRAUSS
United States Attorney
Southern District of New York
for the United States of America

Gillian S. Grossman
Matthew J.C. Hellman
Assistant United States Attorneys
   *Of Counsel*

**Table of Contents**

PRELIMINARY STATEMENT ............................................................................................. 1

BACKGROUND .............................................................................................................. 3

   I.   The Offense Conduct .......................................................................................... 3

      A.   Overview............................................................................................................ 3

      B.   Clark Discusses Committing Violent Attacks in New York City ................. 4

      C.   Clark Attempts to Hide his Conduct from Law Enforcement ....................... 7

      D.   Clark Administers Dozens of Encrypted Online Channels, Calls for "Lone Wolf" Attacks, and Distributes Materials Including Attack and Bomb-Making Instructions .. 9

      E.   Clark Pledges Allegiance to ISIS.................................................................. 11

   II.   The Arrest ........................................................................................................ 14

   III.   The Charges and Clark's Guilty Plea ............................................................ 18

DISCUSSION ................................................................................................................ 20

   I.   Applicable Law ................................................................................................. 20

   II.   The Undisputed Guidelines Sentence Is 240 Months' Imprisonment ............. 21

      A.   The Terrorism Enhancement Does Not Overstate Defendant's Offense Level and Criminal History............................................................................................ 22

   III.   The Statutory Sentencing Factors Call for a Guidelines Sentence of 240 Months' Imprisonment and the Imposition of Lifetime Supervised Release .............................. 26

      A.   The Nature and Seriousness of Clark's Conduct and the Need for Just Punishment Warrant a Guidelines Sentence .................................................................. 26

      B.   A Guidelines Sentence Is Necessary to Protect the Public from Further Terrorism Crimes Committed by Clark................................................................................ 34

      C.   A Guidelines Sentence Will Avoid Creating Unwarranted Sentence Disparities ........ 39

      D.   A Guidelines Sentence Is Necessary To Afford Adequate Deterrence and To Promote Respect for the Law.................................................................................... 43

   CONCLUSION.................................................................................................. 45

## Table of Authorities

**Cases**

*Gall v. United States*, 552 U.S. 38 (2007) ...................................................................... 20

*United States v. Aaron T. Daniels*, No. 16 Cr. 222 (S.D. Ohio 2018) .......................... 41

*United States v. Alhaggagi*, 978 F.3d 693 (9th Cir. 2020)...................................... 24, 25

*United States v. Alimehmeti*, 16 Cr. 398 (S.D.N.Y. 2017)............................................ 24

*United States v. Asher Abid Khan*, No. 15 Cr. 263 (S.D. Tex. 2019).......................... 41

*United States v. Caesar*, 388 F. Supp. 3d 194 (E.D.N.Y. 2019)............................ 40, 41

*United States v. Islam Said Natsheh*, No. 16 Cr. 166 (RS), (N.D. Cal. 2016)............................ 41

*United States v. Meskini*, 319 F.3d 88 (2d Cir. 2003)................................... 22, 23, 34

*United States v. Mumuni Saleh*, 946 F.3d 97 (2d Cir. 2019) ...................................... 24

*United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) ..................................... 22, 23, 43

**Statutes**

18 U.S.C. § 2339................................................................................................. 18, 19, 21

18 U.S.C. § 3553................................................................................................... passim

18 U.S.C. § 842........................................................................................................... 19

**Other Authorities**

U.S.S.G. § 2M5.3........................................................................................................ 21

U.S.S.G. § 2M5.3........................................................................................................ 21

U.S.S.G. § 3A1.4................................................................................................... 21, 22

U.S.S.G. § 3E1.1........................................................................................................ 21

Violent Crime Control and Law Enforcement Act of 1994....................................... 22

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in connection with the sentencing of Zachary Clark, a/k/a "Umar Kabir," a/k/a "Umar Shishani," a/k/a "Abu Talha" ("Clark" or the "defendant"), scheduled for May 12, 2021.

Clark is a 42-year-old New York City resident who repeatedly pledged his allegiance to the Islamic State of Iraq and al-Sham ("ISIS"), extensively discussed his desire to commit a violent attack in the United States on behalf of ISIS and die as a martyr, and, in what he called "my jihad," and "media work I'm doing directly for IS," disseminated enormous quantities of pro-ISIS propaganda and terrorist attack-training manuals across numerous online chatrooms. As a prolific participant and administrator of over a dozen pro-ISIS encrypted online chatrooms, Clark exhorted his online audience to commit acts of murder on behalf of ISIS by engaging in, among other things, "lone wolf" violence including knife attacks, truck and other vehicle attacks, and bombings. Clark urged his followers to attack civilians, law enforcement, and members of the military in "every country" in the world, but particularly advocated for attacks against targets in New York City including the subway system and at notable landmarks.

In addition to Clark's management of what were among the world's most popular online forums for ISIS-adherents, Clark engaged individuals he believed to be ISIS supporters in one-on-one chats, including over a dozen confidential sources working at the direction of law enforcement and undercover law enforcement employees, and extensively discussed his desire to personally commit attacks or see attacks carried out in the name of ISIS. Although Clark expressed concern that law enforcement was monitoring his activities, researched and discussed methods to mask his involvement in the offenses, and directly confronted members of law enforcement who were surveilling him, Clark's knowledge that his conduct was illegal and belief that it was the subject

of law enforcement scrutiny did nothing to curtail his commitment to ISIS's murderous agenda. In November 2019, Clark was arrested by law enforcement in Brooklyn, and subsequent searches of his home, a storage unit, and media devices confirmed his extensive involvement in supporting ISIS's mission. Chillingly, those searches confirmed that Clark's radicalization efforts were not confined to his internet activity, but extended to his home life. There, ISIS iconography and his support of ISIS fighters permeated his domestic existence, extending even to his one-year-old child, with whom Clark staged photographs and posed making gestures of support for ISIS.

As explained below, the Government respectfully submits that the Court should sentence Clark to 240 months' imprisonment, which is the sentence called for by the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G") and recommended by the United States Probation Office (the "Probation Office"). The Government and the Probation Office also recommend that the Court sentence Clark to a lifetime period of supervised release. Such a sentence is necessary and appropriate to reflect the extremely serious nature of Clark's terrorism offenses, to provide just punishment for his conduct, to deter and prevent Clark from resuming his activities in support of radical Islamic terrorist ideology, and to deter others in the United States from, like Clark, seeking to join and serve violent terrorist groups such as ISIS.

Clark chose not only to devote himself to a terrorist organization dedicated to the murder of Americans and the destruction of plural society in the West, he sought to convey ISIS's message to the widest possible audience and convince others to commit themselves to indiscriminate killing and hate. Clark drew no distinctions and set no boundaries; his efforts to radicalize others extended to his own young family and encouraged attacks in the city where he and they lived, including attacks on the very public infrastructure they used in their daily lives in New York. The defense

fails to persuasively argue that any mitigating considerations counsel against a non-Guidelines sentence.  A Guidelines sentence is appropriate in this case.

## BACKGROUND

### I.     The Offense Conduct

#### A.     Overview

By in or about March 2019, Clark had radicalized and resolved to devote his efforts to supporting ISIS and extremist Islamic ideology.  By April 2019, Clark, already active in pro-ISIS online chat forums, was corresponding via email and an encrypted chat application with FBI confidential sources posing as ISIS members (the "CSes") and undercover law enforcement officers (the "UCs").  During those communications, Clark discussed his willingness to die as a martyr while conducting a terrorist attack in the United States, and further outlined his interest in supporting ISIS by his involvement in pro-ISIS media operations.  In the months between March and November 2019, Clark followed through on his ambition and posted pro-ISIS content in over a dozen encrypted chatrooms, including materials encouraging attacks in New York City, and detailed manuals to conduct attacks, including by using knives, vehicles, and through the construction and deployment of improvised explosive devices.  In July 2019, in a video sent to one of the CSes, Clark pledged allegiance to ISIS; Clark reaffirmed this pledge in October 2019, following the death of ISIS leader Abu Bakr al-Baghdadi, when he pledged his support to ISIS's new leader, Abu Ibrahim al-Sashemi al-Qurayshi.  Ultimately, Clark was active in over a dozen

separate chatrooms disseminating pro-ISIS propaganda and attack guides. [1]  Clark was arrested in November 2019.

### B.  Clark Discusses Committing Violent Attacks in New York City

Clark is a 42-year-old native of the United States who resided in the Bronx and Brooklyn prior to his arrest in this case.  Presentence Investigation Report, dated October 30, 2020 ("PSR"), ¶ 115.[2]  In March of 2019, Clark initiated contact with one of the CSes ("CS-2"),[3] who was posing as an ISIS member, outlined his already deep commitment to ISIS and violent attacks, and began communicating with CS-2 using the encrypted application.  *Id.* ¶¶ 31, 32.  From the outset, Clark indicated he sought to commit a violent attack and sought the assistance of others to do so.  For example, on or about March 17, 2019, in a chat with CS-2 regarding the potential risks of an operation, Clark replied, "Akhi death prison etc is always a possible outcome but look at the prison I've lived in for all these years and we die before we die anyway and as martyr I mean it's decision I've made some time ago just have been skeptical to continue reaching out to strangers so yes

---

[1] Clark used an encrypted application that allows users to send and receive messages in exchanges referred to as "chats," which are private between the participants, and also allows users to create "channels." PSR ¶ 25.  Subscribers to channels can communicate with and disseminate information to other members of that user community, and the creator or "owner" of a channel can designate one or more "administrators" to help manage the channel.  *Id.*  Management of a channel includes the administrator's ability to add and remove subscribers, change the name of the channel, and post and remove content from the channel.  *Id.*

[2] Clark does not dispute the factual recitation of his offense conduct set forth in the PSR.  *See* PSR at 5-17, 29.  The offense conduct summarized in the PSR and herein is culled principally from emails, chats, and messages involving Clark, the CSes, and the UCs, as well as documentary and physical evidence seized from Clark, his residence, and his storage unit following his arrest.

[3] Particular CSes and UCs designations referenced herein (*i.e.*, CS-1, CS-2, etc.) are the same as the designations used throughout the PSR and the Complaint.  *See* Dkt. at 1.

mashAallah I've found help and I hope you are for real because Allah has United us to do his work."[4]

On April 15, 2019, Clark told CS-2 that he administered a private channel on the encrypted application with 73 members.  Later in their exchange, Clark told CS-2 "I also know video editing and media" and offered to edit ISIS-related media CS-2 could provide him.  On April 17, 2019, Clark made clear that he intended to wage jihad inside the United States.  In particular, after CS-2 told Clark that one could perform jihad anywhere, Clark replied, "I've thought about here / Because I'm in the belly of the beast Akhi / Land of kuffar […] I would need resources tho / Do you have any us contact besides me?"[5]  After CS-2 replied and explained that one can participate in jihad through use of various skills, Clark replied "Speech is powerful […] I want to do media […] What if I set up a site and you send me content […] I need content that I can voice over for the English brothers so much video is in different language."

Clark asked the source for help funding and planning a terrorist attack, claimed he knew how to use AK-47 and AR-15 firearms, and expressed approval and excitement regarding ISIS members involved in combat.  *Id.* ¶ 72.  Although Clark discussed travel to, among other places, Turkey—which he described to CS-2 as a gateway for warriors fighting on behalf of ISIS—he ultimately resolved to support the cause from his place in New York City.  *Id.*

On April 18, 2019, Clark expanded on his motivations and plans to CS-2 in an email sent over an encrypted email platform, writing, in part, "[E]ven for me to take action here I would need

---

[4] Unless otherwise indicated, quotes throughout this submission are reproduced as in the originals, including spelling errors.
[5] "Kuffar" is a derogatory reference to non-Muslims.  PSR ¶ 45.

funding and advice.  I am willing to stay and die as a true majahid[6] here amongst the swine and really make example even if I have to die a martyr…but I would need money for materials and some help."  Later, on April 26, 2019, Clark repeated his desire to commit a violent attack, writing:

> "I've decided some things in last week's and as you know the days are running out and Ramadan is well on it's way I plan to go out as a Martyr , a true shahada[7] mujahid. For this I will need some help from the brothers and superiors.. I have something picked out that would indeed leave our mark on these pigs, these kuffr I would trade shoes with anyone in the fight or even those just struggling and striving with the hungriest of belly's to get away from this land and since I cannot why not go forth with destruction here during Ramadan so please talk with ikhwa[8] and tell them my ideas and see what help I can get and in meantime brother stay strong and stay safe please. I would like for you to call me if you can and want to just to hear you for bit and I will gladly look into those coming from US give me names that's all I'll need. All my love brother, Umar"

After CS-2 replied to the above message, Clark wrote, "yes inshallah I'm very serious and would like to make it happen over Ramadan but I'll give you details and I need help with materials, instructions etc maybe some cash and someone in the ikhwa that knows exactly about what I'm talking about […]"   In another message to CS-2 sent April 26, 2019, Clark wrote:

> "hope you are well and all of you are staying safe as I see plenty of work being done over there and mashallah it warms my heart with every headline or news story to know that the ikhwa are fighting a war, not for any other reason than to please Allah sabhana wa taalla and if my brothers can spare their own lives every day then so can and I and that's where I planned this campaign. Please as I know something like this takes work and planning to go well and as I said I will need someone with very good English to instruct me and guide

---

[6] "Majahid" appears to be a misspelling of *mujahid*, a term that refers to a person engaged in jihad. PSR ¶ 33.
[7] The "shahada" is the Islamic declaration of faith.  ISIS's flag features a version of the shahada.
[8] "Ikhwa" is a term used to denote ISIS members.  PSR ¶ 34.

me as will I need funding for supplies and materials etc and let's not
waste too much time as it would be best done during Ramadan."

By May 2019, Clark asked CS-2 for an English translation so that he could make *bayat*, or

pledge allegiance, to ISIS and its leader.  On May 1, 2019, CS-2 offered to introduce Clark to

others who could facilitate an attack and asked if Clark was willing to sacrifice himself, and Clark

responded, "the answer is yes and I will do WHATEVER I have to."  *Id.*  CS-2 then introduced

Clark online to two undercover law enforcement officers posing as ISIS representatives, ostensibly

to facilitate an attack.  *Id.* ¶ 34.   Clark and CS-2 discussed the upcoming meeting and the

opportunities it presented to follow through on his plans to conduct an attack, as Clark wrote, "I

cannot sit by and do nothing while here / you fight there and this will become my fight here / it is

a war."  Later, on June 3, 2019, in response to a question from CS-2 about his plans for an attack,

Clark responded with a link to Trump Tower in New York City, and wrote, "What do you think.

It's one of trumps biggest money makers."  *Id.* ¶ 72.

### C.  Clark Attempts to Hide his Conduct from Law Enforcement

In late-May 2019, Clark told CS-2 that he believed the UCs could be informants or

affiliated with law enforcement, and he warned CS-2 of the same.  *Id.* ¶ 34.  In an email Clark sent

on May 28, 2019, Clark discussed the contact CS-2 provided, writing "Akhi I'm worried about

this guy here.  He's said a couple things that didn't add up I'm always watching listening you know

safety comes first […] please if you have a different contact I would rather that and I will meet

him, them etc but idk about this one."   In a contemporaneous encrypted application, Clark

explained that the proposed meeting places with the UCs were "two of the most patrolled and

popular parks in ny / not just by police akhi but military and counter terror officers / just didn't feel right […] I will gladly give my all / but I'm not going to get caught up."

Clark's online behavior was designed to reduce his risk of detection and identification by law enforcement.  *Id*. ¶ 27.  Clark used aliases, discussed his concerns that his communications could be intercepted, and derided the use of more prevalent communications methods which he described as being less secure.  In his role as a channel administrator, Clark warned others about insecure online platforms.  For example, Clark warned in one channel that another chat application "is not a secure platform," was susceptible to law enforcement intelligence gathering techniques, and that his subscribers should "not fall for kuffar dog traps like these."  *Id.* ¶ 52.  In a July 2019 chat with another CS, ("CS-3"), Clark explained that even the encrypted application had to be used carefully, writing that the application "is getting to be scary place w all pigs and kuffar agents its best to be sure nothing can come back to you I even use vpn at time."[9]  *Id.* ¶ 61. Clark also distributed materials in channels he administered regarding operational security; for example, in August 2019, a UC ("UC-1") observed posts in which Clark detailed instructions for "lone wolf" attackers which included conducting preoperational surveillance and avoiding law enforcement attention while preparing for and conducting an attack.  *Id.*

Clark's concerns about law enforcement surveillance were not confined to his online activities.  *Id.* ¶ 73.  In July 2019, members of law enforcement surveilling Clark during the investigation observed that Clark began taking photographs of vehicles with tinted windows,

---

[9] A VPN, or virtual private network, is an application that anonymizes a user's internet activity by masking IP addresses associated with their computer.  PSR ¶ 61.

including vehicles which in fact contained members of law enforcement.  *Id.*  In September 2019, while riding the subway, Clark approached a member of law enforcement conducting surveillance, looked the surveilling officer up and down, and proclaimed, "fucking cops."  *Id.*  Shortly before his arrest, in November 2019, while walking with his family on the sidewalk, Clark broke away and began jogging toward a FBI surveillance vehicle, forcing the operator to drive away to avoid a confrontation.  *Id.*

### D. Clark Administers Dozens of Encrypted Online Channels, Calls for "Lone Wolf" Attacks, and Distributes Materials Including Attack and Bomb-Making Instructions

Throughout the investigation, Clark's activities in channels continued unabated, and his posting across channels was prolific.  On July 29, 2019, Clark told CS-3 that he was the administrator of a channel internationally popular with ISIS supporters, and explained "controlling and distributing media…in itself is action."  *Id.* ¶ 62.  In the days that followed, on July 31 and August 1, 2019, CS-3 and UC-1 observed Clark post on the encrypted application on at least three different pro-ISIS channels—including one with over 190 members—a graphic encouraging a violent attack on the New York City subway system, followed by a highly detailed set of instructions entitled, "Make a bomb in the kitchen of your Mom."  *Id.* ¶¶ 39, 62.  The bomb-making instructions were originally published in *Inspire* magazine, a propaganda publication produced by al Qaeda in the Arabian Peninsula.  This same manual was found in the possession of Ahmad Khan Rahimi, who planted and detonated some of the types of bombs described in the manual in New York and New Jersey in 2016.  *Id.*

Clark's posts included numerous graphics calling for violent attacks in the United States and, in particular, New York City, which were similar to other attacks for which ISIS had claimed

credit.  *Id.* ¶ 41.  For example, Clark posted imagery celebrating the 2017 ISIS truck attack on civilians in Stockholm, Sweden, and posted another graphic with a truck bearing the caption, "the ultimate mowing machine."  *Id.* ¶¶ 41, 44.  Clark frequently paired graphics extolling violence with manuals outlining methods for committing such attacks.  In particular, Clark's postings called for "lone wolf" attacks.

A "lone wolf" terrorist is one who alone plans and executes a terrorist attack on behalf of a terrorist organization without first traveling abroad to meet with and receive training from other members of the terrorist organization.  *Id.* ¶ 75.  "Lone wolf" attacks are a hallmark of ISIS's global terrorism strategy.  *Id.*  Materials Clark distributed included detailed manuals on conducting "lone wolf" attacks including a manual which described methods such as firing a weapon into a crowd at random, driving a truck through a crowd, developing and using chemical weapons, and noted that the best attack "is the one where you come up with an innovative idea that the authorities have not yet turned their attention to, and that leads to maximum casualties or—equally important—maximum economic losses."  *Id.* ¶ 48.  On September 15, 2019, Clark sent CS-3 an email in which he wrote that the "kuffar in position of authority" were "so scared" and "fearing the lone wolf."  *Id.* ¶ 69.

Clark posted content he created as well as those created by others.  While exchanging messages with UC-3 in October 2019, Clark confirmed to UC-3 he had created graphics in a particular channel.  *Id.* ¶ 70.  In a message in early July 2019, CS-3 asked Clark how he had created images he had posted in one channel, and Clark replied by advising CS-3 to use a particular photo-editing application.  *Id.* ¶ 60.  In a later phone call between Clark and CS-3 which occurred on August 18, 2019, Clark explained that he stored terrorist training materials on his cellphone and a

tablet at home, and that he was serving ISIS through the distribution of propaganda and the manuals. *Id.* ¶ 64.

Clark's postings were prolific. On August 25, 2019, Clark invited UC-3 to a new channel that Clark explained he was starting. *Id.* ¶ 51. UC-3 observed that within six days of starting the channel, Clark had created approximately 46 pages of pro-ISIS content. *Id.* This content included a three-part video demonstrating how to create a suicide bomb; a manual for poisoning food supplies; manuals regarding explosives, firearms, chemical and biological weapons; and details for the manufacture of poison gas, nerve gas, and ricin. *Id.* ¶¶ 54, 55. Clark followed these manuals by posting text encouraging followers to "answer the call" by committing a violent attack. *Id.* In September 2019, another channel Clark administered had approximately 80 subscribers for which Clark had posted more than 100 documents, available for download as PDFs, including "Bloody Brazilian Knife Fighting Techniques," "Four Easy Ways of Making an Explosive Belts," and "Weapons of Jihad." On September 15, 2019, Clark again explained his intentions in posting the terrorism materials: "I always know in my heart that this is my jihad for now working with media and channels etc. and not letting any kuffar get in way or back me down." *Id.* ¶ 69.

### E. Clark Pledges Allegiance to ISIS

In July 2019, Clark formally pledged *bayat* to ISIS in a video that he sent to one of the CSes ("CS-1") and that was later recovered by the FBI. *Id.* ¶ 24. The video featured what appeared to be a homemade ISIS flag displayed in a window behind Clark, who pledged *bayat* by stating, in substance and in part, "We renew our *bayat* to Emir, the khalifah of the Muslims, Sheik Mujahid Abu Bakr al-Baghdadi al Husseini al Qurayshi, may Allah preserve him, pledge to listen and obey in times of hardship and ease, and we do so selflessly, and to not dispute the matter of those in

authority except if you see blatant Kuffar concerning which we have proof from Allah. Takbir,

Allahu Akbar, Takbir, Allahu Akbar, Takbir, Allahu Akbar." *Id.* ¶ 30.  A still image from the

video is depicted below:



In one channel Clark administered, he encouraged his subscribers to pledge *bayat* as well.  *Id.* ¶

56.  On September 16, 2019, Clark posted an image of what appeared to be a homemade ISIS flag

and added the text that supporters should "make bayah and show the support needed to our beloved

Emir and state," as depicted below.  *Id.*



On or about October 27, 2019, following the death of ISIS's Emir, or leader, Abu Bakr al-Baghdadi, in a U.S. military operation on October 26, 2019, Clark posted a message on the encrypted application mourning al-Baghdadi's death and promising revenge, as depicted below:

Sunday, October 27, 2019

 **Abu**                                                              11:00:37 AM

 **Abu Talha** Oct 27, 2019 11:00:11 AM
Trump and his clowns are loving every minute of the news and we all know that what they may have thought they put end to has only opened up a new onslaught as it should because that is our jobs, we took oaths. They will pay and in end they would beg the mercy our Emir has shown for this will be merciless! May Allah now watch the Emir and his children and let them rest their weary heads on pillows made of clouds.

On or about November 1, 2019, Clark posted again, pledging *bayat* to al-Baghdadi's replacement, Abu Ibrahim al-Sashemi al-Qurayshi, as depicted below.  *Id.* ¶ 71.



13

On or about October 28, 2019, Clark sent a message to subscribers of a pro-ISIS channel on the encrypted application asking that "any brothers stuck here in the land of kuffar message me privately," as depicted below:



## II.    The Arrest

Following Clark's November 2019 arrest, the FBI executed search warrants at Clark's residence and at a separate storage unit that Clark maintained.  *Id.* ¶ 77.  Among other things, the FBI recovered a handmade ISIS flag, which appeared to be identical to the one displayed beside Clark in the July 2019 *bayat* video; a remote-operated camera drone to which the Arabic phrase featured on the ISIS flag had been affixed; dozens of books which included volumes on ISIS, global terrorism, war and battle tactics, jihad, and Osama bin Laden; a drawing of the ISIS flag; a stencil of the ISIS emblem; and a t-shirt with a hand-painted ISIS logo matching the stencil.  *Id.*

FBI agents observed that Clark had a tattoo on his hand featuring a drawing of a wolf alongside the initials "L W."  *Id.* ¶¶ 75, 118.  FBI agents interviewed Clark following his arrest and, after he was issued *Miranda* warnings which he waived, Clark discussed the tattoo, and claimed that the initials referred to a girlfriend who had passed away.  *Id.*  Images recovered from a judicially authorized search of a phone belonging to Clark's girlfriend, revealed that an identical image of the wolf tattoo saved on Clark's girlfriend's phone featured the words, "Lone Wolf"

spelled out instead of the abbreviated version Clark had on his hand.  Clark's girlfriend's phone also contained text messages from as early as October 2018 with Clark discussing ISIS, images including a tattoo Clark received depicting the name and logo of one of the encrypted application channels Clark maintained, and at least 20 photos that depict Clark holding up his index finger to the sky in a well-known gesture signifying support for the "one state" of ISIS, including photos with Clark's girlfriend.[10]  *Id.* ¶¶ 76, 80.  One such photo depicts Clark displaying this symbol in front of an NYPD vehicle, and another depicts Clark holding the hand of his and Clark's girlfriend's toddler-aged child in the same gesture of allegiance to ISIS, as shown below.  *Id.*

 

---

[10] ISIS supporters often display a single raised index finger as a symbol of "Tawhid," which encapsulates the concept of monotheism within Islam, and represents ISIS's goal of a single worldwide caliphate.

Searches of Clark's devices revealed hundreds of videos and images related to his support of ISIS. *Id.* ¶ 79. Many of the photographs depicted the ISIS flag, including what appear to be ISIS fighters carrying the ISIS flag, including as in the examples below:

 

The videos included graphic depictions of extreme violence, including videos of ISIS members committing executions by shootings, beheadings, and torture, included ISIS members tying up prisoners and setting them on fire while they were still alive. *Id.* In the first example below, the image of ISIS's flag is at the top right of a still image from a video showing what appears to be ISIS members committing a mass execution, and in the second, a victim kneels before an executioner depicted standing beside ISIS's flag:





The images recovered also included ISIS propaganda images depicting what appear to be children posed in apparent support of ISIS, as in the two images below:



Other images related to acts of terrorist attacks, including in the United States, such as the image below, which depicted lower Manhattan in the immediate aftermath of the 9/11 attacks on

17

the World Trade Center, over which a photograph of Osama bin Laden and a bin Laden quote as to the purported justification for those attacks were superimposed, as shown below:[11]



Clark's devices also included bookmarked websites and searches related to violent terrorist attacks, roles in suicide bombings, ISIS propaganda and official publications, access to the dark web and other secure methods of reaching jihadists online, and an English-language terrorism training center, including information on weapons, computer hacking, encryption, and becoming a suicide bomber.  *Id.*

## III.    The Charges and Clark's Guilty Plea

On November 25, 2019, Clark was charged in Complaint 19 Mag. 11095 with attempting to provide material support and resources to a designated foreign terrorist organization (ISIS), in violation of 18 U.S.C. § 2339B, and distribution of information relating to explosives, destructive

---

[11]    "*Text: Osama bin Laden,*" Washington Post, October 7, 2001, https://www.washingtonpost.com/wp-srv/nation/specials/attacked/transcripts/binladen_100801.htm (Retrieved May 5, 2021)

devices, and weapons of mass destruction, in violation of 18 U.S.C. § 842(p).  Dkt. 1.  On January 27, 2020, a grand jury in this District returned Indictment 20 Cr. 76 (NRB) charging Clark with providing and attempting to provide material support and resources to a designated foreign terrorist organization (ISIS), in violation of 18 U.S.C. § 2339B, and distribution of information relating to explosives, destructive devices, and weapons of mass destruction, in violation of 18 U.S.C. § 842(p).  Dkt. 7.

On August 10, 2020, Clark pled guilty to Count One of the Indictment, pursuant to a plea agreement with the Government (the "Plea Agreement").  Dkt. 19.  Under the terms of the Plea Agreement, the parties stipulated to an applicable Guidelines sentence of 240 months' imprisonment.

During his allocution at the plea proceeding, Clark admitted, among other things, as follows:

> I would say probably around 2019 or so, I knowingly did provide, create, distribute propaganda on social media for an organization at the time I knew had prior engagement to terrorism.  A majority of the stuff took place while I was in the Bronx.  And my conduct was wrong and illegal, so I take accountability for that, ownership.  I do apologize to the people.  That about sums it up.

Dkt. 19 at 13.  The Court asked Clark, "You said you were creating on social media material for an organization that you knew had terrorist connections, is that right?"  *Id*.  Clark replied, "Yes. That's right."  *Id*.  The Court further asked Clark if he was aware that the terrorist connections were to ISIS, a fact which Clark also affirmed.  *Id*.

19

## DISCUSSION

**I.    Applicable Law**

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).  After that calculation, a sentencing judge must consider the seven factors outlined in 18 U.S.C. § 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant"; the four legitimate purposes of sentencing, as set forth below; "the kinds of sentences available"; the applicable Guidelines range itself; any relevant policy statement by the Sentencing Commission; "the need to avoid unwarranted sentence disparities among defendants"; and "the need to provide restitution to any victims."  18 U.S.C. § 3553 (a)(1)-(7); *see Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553 (a)(2).

## II.     The Undisputed Guidelines Sentence Is 240 Months' Imprisonment

It is undisputed that the Guidelines call for a sentence of 240 months' imprisonment.  As set forth in the PSR, and consistent with the terms of the Plea Agreement, the defendant's Guidelines offense level is calculated as follows:

- The Guideline that applies to a violation of 18 U.S.C. § 2339B is U.S.S.G. § 2M5.3, which yields a base offense level for Count One of 26.  PSR ¶ 86.

- Pursuant to U.S.S.G. § 2M5.3(b)(l)(E), because the offense involved the provision of material support or resources with the intent, knowledge, or reason to believe that they were to be used to commit or assist in the commission of a violent act, two levels are added.  *Id.* ¶ 87.

- Pursuant to U.S.S.G. § 3A1.4(a), because the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, 12 levels are added.  *Id.* ¶ 28. The adjusted offense level for Count One therefore is 40.  *Id.* ¶ 91.

- Assuming the defendant continues to demonstrate acceptance of responsibility prior to the imposition of sentence, *see* U.S.S.G. § 3E1.1(a), and because he timely notified authorities of his intention to plead guilty, *see id.* § 3E1.1(b), the offense level is decreased by three levels.  PSR ¶¶ 93-94.

- Accordingly, the total offense level is 37.  *Id.* ¶ 95.

The defendant has six prior criminal convictions, including a 1996 youthful offender adjudication for burglary, a 2000 conviction for reckless driving, 2003 conviction for burglary and robbery, and convictions in 2003, 2013, and 2014 for petit larceny.  *Id.* ¶¶ 98-103.  However, because the offense involved a federal crime of terrorism, the applicable criminal history category ("CHC") is VI, pursuant to U.S.S.G. § 3A1.4(b).  *Id.* ¶ 107.  A total offense level of 37 and a CHC of VI result in a Guidelines range of 360 months to life imprisonment.  *Id.* ¶ 81.  However, because the statutorily authorized maximum sentence for Count One is 240 months' imprisonment, the applicable Guidelines range—or, in this case, Guidelines sentence—is 240 months' imprisonment, as stipulated in the Plea Agreement.  *Id.* ¶ 12.

### A.  The Terrorism Enhancement Does Not Overstate Defendant's Offense Level and Criminal History

While the defendant concedes that the applicable Guidelines sentence is 240 months' imprisonment, he suggests that his offense level and CHC are overstated as a result of the application of the 12-level terrorism enhancement pursuant to U.S.S.G. § 3A1.4(a).  *See* Def. Sentencing Mem., dated April 28, 2021, Dkt. 27 ("Def. Mem."), at 8-10.  The suggestion is without merit.  In 1994, Congress mandated that the Sentencing Commission establish a Guidelines enhancement for terrorism offenses to ensure that those convicted of such crimes receive punishment commensurate with the extraordinary nature of their conduct.  *See United States v. Stewart*, 590 F.3d 93, 172 (2d Cir. 2009) (citing Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, § 120004, 108 Stat. 1796, 2022).  The resulting terrorism enhancement at U.S.S.G. § 3A1.4(a) reflects Congress's intent that defendants, like Clark, convicted of terrorism offenses serve sentences that are appropriate in light of the extreme dangerousness of their crimes and the unique risk of recidivism that they present.  As Judge Walker explained in his concurrence in *Stewart*:

> The import of this enhancement "could not be clearer": It reflects Congress' and the Commission's policy judgment "that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time."

*Id.* at 172-73 (quoting *United States v. Meskini*, 319 F.3d 88, 91-92 (2d Cir. 2003)).

The enhancement appropriately reflects the seriousness of the conduct in this case.  As set forth above, Clark devoted himself to a violent terrorist organization responsible for the murders of countless American civilians and soldiers.  Clark both sought advice, funding, and material to

22

advance its cause by personally committing an act of destructive violence resulting in his martyrdom here in the United States, as well as created, collected, and prolifically promulgated advice, training materials, detailed instructions, propaganda, and exhortations to murderous violence to an online audience whose total numbers are unknowable.  Providing material support and resources—in this case, training, services, and personnel—to a dangerous foreign terrorist organization is a quintessential terrorism offense of the utmost seriousness.  Such conduct falls squarely within the class of dangerous activity that Congress has deemed worthy of significant punishment through the application of the terrorism enhancement, and the Guidelines do not overstate the seriousness of Clark's conduct.

Nor is the enhancement's impact on the defendant's CHC inappropriate, as the defense suggests.  Def. Mem. at 8.  Rather, the effect of the terrorism enhancement on the applicable CHC reflects the Sentencing Commission's assessment of the high likelihood of recidivism, and the corresponding need for deterrence, in terrorism cases such as this one—an assessment the Second Circuit has endorsed.  *See Stewart*, 590 F.3d at 143 (citing *Meskini*, 319 F.3d at 92).  As the Second Circuit more recently observed:

> We conclude by underscoring that the Guidelines, while only advisory, appropriately reflect Congress's considered judgment that terrorism is different from other crimes.  […] Moreover, when it comes to sentencing terrorism, Congress and the United States Sentencing Commission "plainly intended for the punishment of crimes of terrorism to be significantly enhanced without regard to whether, due to events beyond the defendant's control, the defendant's conduct failed to achieve its intended deadly consequences."  Thus, in determining what constitutes a "sufficient" sentence for a terrorist defendant whose conduct did not result in death or physical injury, a sentence at the high end of the applicable range may plainly be reasonable if supported by the balance of § 3553(a) factors.

*United States v. Mumuni Saleh*, 946 F.3d 97, 113 (2d Cir. 2019). *See also United States v. Alimehmeti*, 16 Cr. 398 (PAE) (S.D.N.Y.), Dkt. 133 at 16 ("The Second Circuit has, time and again, in its words expressly upheld the lawfulness of the terrorism enhancement. And the Circuit has also specifically found that the Sentencing Commission had a rational basis in fashioning that guideline to increase both a defendant's offense level and his criminal history category.  It has reasoned to the latter that even terrorists with no criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation.") (internal quotations and citations omitted).

The defendant's reference to *United States v. Alhaggagi*, 978 F.3d 693 (9th Cir. 2020) is misplaced.  Def. Mem. at 9.  Of course, the defendant here has stipulated that the terrorism enhancement applies in this case.  PSR ¶ 91.  In any event, the *Alhaggagi* decision is not controlling in this Circuit and does not support finding the terrorism enhancement inapplicable on the facts of this case.  The court in *Alhaggagi* concluded that the Government had not established that the defendant's non-violent material-support offense was intended to influence government conduct under Section 2332b(g)(5)(A)(1), and explicitly noted that "[i]n cases involving violent acts of terrorism, specific intent is relatively easy to identify, either from the statements or admissions of the defendant or the nature of the offense."  *Id.* at 701; *see id.* at 699 (explaining that terrorism enhancement "does not automatically apply to all material support offenses," and "Congress created this distinction in order to punish certain dangerous terrorists more severely than persons who committed non-violent crimes").  *See also Alimehmeti*, 16 Cr. 398 (PAE) (S.D.N.Y.), Dkt. 133 at 17 ("Alimehmeti repeatedly challenges the enhancement on the ground that it results in

24

double-counting with respect to his offense level in that his starting offense level for material support to a terrorist organization is then "enhanced for terrorism itself."  But in fact, the enhancement, although applicable in many material support cases, does not apply to literally all. As the Second Circuit has noted, a conviction for material support of a terrorist organization does not necessarily imply that the defendant committed an act of terrorism.  Not all material support for terrorism is calculated to affect government conduct.") (internal quotations and citations omitted).  In this case, Clark's service to ISIS and its cause, dissemination of propaganda and attack and bomb-making materials, and avowed commitment to "lone wolf" terrorist attacks by himself and others, was calculated to affect and retaliate against government conduct.  Clark ratified this in his submission, explaining that his motivations included the U.S. Government's "unfair" treatment of ISIS and U.S. conduct in Syria, among other things.  Def. Mem. at 10.  The reasoning of *Alhaggagi* thus supports applying the enhancement here.

In sum, application of the terrorism enhancement is entirely appropriate, and it is undisputed that the Guidelines call for a sentence of 240 months' imprisonment.  *See* PSR at 30; Def. Mem. at 8.  The Probation Office, which notes that "the nature of the offense involves […] the promotion and commission of violent acts of terrorism, in support of, and as mandated by ISIS" and "the defendant has pledged allegiance to ISIS and has expressed his intention to commit acts of terrorism in the United States" representing "a disregard for the law, for the lives of others, and an extreme danger to the community" recommends that the Court sentence Clark to 240 months' imprisonment and lifetime supervised release, as prescribed by the Guidelines.  PSR at 30-37.  As explained below, the statutory sentencing factors, *see* 18 U.S.C. § 3553(a), also call for the

imposition of a Guidelines sentence of 240 months' imprisonment and a lifetime term of supervised release.

## III.    The Statutory Sentencing Factors Call for a Guidelines Sentence of 240 Months' Imprisonment and the Imposition of Lifetime Supervised Release

### A. The Nature and Seriousness of Clark's Conduct and the Need for Just Punishment Warrant a Guidelines Sentence

The indisputably serious nature of Clark's conduct, and the need to impose just punishment, weigh decidedly in favor of a Guidelines sentence.  *See* 18 U.S.C § 3553(a)(1), (a)(2)(A).  Clark's own words over months of discussion with law enforcement sources and officers demonstrate his commitment to personally conduct an attack in New York City.  He discussed committing a "lone wolf" attack that he anticipated would be violent, destructive, and would end with his martyrdom.  Clark's dedication to "lone wolf" attacks included his decision to have a "lone wolf" emblem tattooed on his hand.  In addition to Clark's avowed goal of committing an attack himself, Clark distributed enormous quantities of propaganda and materials to inspire and instruct others to commit similar deadly acts.

Clark knew the seriousness of his conduct and took substantial steps over the course of the investigation to remain conscious of law enforcement efforts to monitor his behavior.  Although Clark claims he "refused" to meet with undercover law enforcement officers (Def. Mem. at 11), his contemporaneous chats demonstrate his refusal was only because *he believed they were police*. First, in chats with CS-2, Clark indicated he was "willing to stay and die […] and really make [an] example even if I have to die a martyr" but explained that he "nee[ed] funding [in] advance" and "help with materials, instructions etc, maybe some cash."  After CS-2 established contact between Clark and the UCs, Clark and told CS-2, "just talking with him in meantime…I trust him because

of my love and trust for you."  However, after communicating directly with the undercover officers, Clark explained his misgivings in clear terms to CS-2: the individuals to whom he had been introduced were either law enforcement or informants, and Clark warned CS-2 that he did not believe they could be trusted.  In this exchange, Clark made clear that he knew his conduct was illegal; that such a meeting could get him "caught up," or arrested; that he was avoiding places where he could be observed by law enforcement or, in particular, "counter-terror" officers; and that he was still willing to meet other ISIS members to further his aim of a violent attack.

Clark's reaction is not indicative of any unwillingness or hesitancy to conduct an attack, but is instead illustrative of his dangerousness and the care he took in maintaining his own operational security.  Indeed, Clark manifested his awareness of law enforcement scrutiny throughout the investigation.  In July 2019, surveillance team members observed Clark taking photographs of cars with tinted windows, including their own; in September 2019, Clark conspicuously approached a surveillance team member and exclaimed, "fucking cops"; and in November 2019, Clark's confrontational approach escalated when he ran towards a surveillance team member's vehicle, forcing the team member to drive away to avoid confrontation.  In spite of his knowledge that members of law enforcement were actively surveilling him, Clark continued his offense conduct for months.

By linking ISIS propaganda to practical guides outlining methods for individuals to wage war against civilian populations by weaponizing everyday items and then extensively distributing it across dozens of encrypted chat channels to hundreds of followers a day, Clark promulgated ISIS's vision while providing a vast audience with the means to commit atrocities.  Defense counsel's suggestion that Clark's conduct falls "at the absolute bottom of the range of material-

support offenses" (Def. Mem. at 10) is wrong; conduct like Clark's is deeply important to an organization like ISIS, helps ISIS recruit members, radicalizes the vulnerable or undecided, and has been shown to be linked to real-world attacks that have caused the senseless and violent deaths of countless civilians, including attacks in New York City.  Clark's conduct was not the realm of online fantasy or harmless discussion, it was calculated to cause real world damage and, given the opportunity, Clark was prepared to cause that damage himself.

ISIS's propaganda efforts, including online recruitment and incitement to violence in particular, have been a core component of its identity and operations since its inception.[12]  In 2019, when Clark was active, ISIS's media components worked to shift the narrative from the organization's military losses and territorial contractions by highlighting the importance of ISIS's war of attrition and guerilla tactics in weakening the resolve of a plural, democratic West, as well as Muslims opposed to ISIS's corrupted brand of Islam.[13]  The tactics propounded by ISIS leadership and echoed in propaganda called for "lone wolf" attacks and lionized such attacks in the West; for example, in a speech in which ISIS's then-leader al-Baghdadi urged followers in "Canada, Europe, and elsewhere" to "carry out an attack that breaks their heart, and rip them apart … either with gunfire, or a stab to their bodies, or a bombing in their countries … do not forget

---

[12] In addition to the dissemination of propaganda and materials by a network of online actors including the defendant, ISIS operates various official media outlets, including the Amaq News Agency and the al-Furquan Foundation, through which the group, for example, at times, posts official claims of responsibility for ISIS attacks around the world.  Additionally, the organization distributes various publications online, including magazines called *Dabiq*, *Rumiyah*, and *al Naba*, in which the group also praises and takes credit for attacks, and identifies its members.
[13] *See, e.g.*, "*Selling the Long War: Islamic State Propaganda After the Caliphate*," Dr. Michael Munoz, CTC Sentinel, Combating Terrorism Center and West Point, https://ctc.usma.edu/selling-long-war-islamic-state-propaganda-caliphate/ (Retrieved May 4, 2021).

about running people over on the roads."[14]  Al-Baghdadi further noted that one such attack in the West was the equivalent of a thousand attacks in Iraq or Syria.  ISIS's commitment to spreading its message online is deep, and the organization has devoted significant resources to using social media and other online vehicles to refine its image and recruit new members to join.[15]

Clark understood the power of ISIS's online propagandizing and recruitment efforts, and made clear in his early communications with the CSes that he viewed his provision of "media" support as important as his offers to commit a physical attack.  Although Clark explained that he found his existence "in the belly of the beast/among the swine" intolerable and would commit an attack if supplied with materials and funding to do so, Clark also recognized that his basic knowledge of graphics editing, English-language skills, and online savvy meant that he could provide extensive support to ISIS from home.  Clark sought to augment those skills by taking Arabic language courses, requesting additional materials such as songs, documents, videos, or radical religious sermons from others, conducting extensive online research, and discussing methods of concealing his online activities.  Clark's own conduct and statements demonstrate that he viewed his role in "doing media" for ISIS to be in no way inferior to traveling overseas to fight for ISIS or conducting an attack where he lived.  Clark was not a casual consumer or distributor

---

[14] "*ISIS Leader Baghdadi Resurfaces in Recording*," New York Times, August 22, 2018, https://www.nytimes.com/2018/08/22/world/middleeast/isis-leader-baghdadi-recording.html (Retrieved May 4, 2021).
[15] "*Why ISIS is Winning the Social Media War*," Wired Magazine, April 2016, https://www.wired.com/2016/03/isis-winning-social-media-war-heres-beat/ (Retrieved May 4, 2021).

of ISIS materials and propaganda; he collected, consumed, and delivered massive quantities of pro-ISIS material to an online audience of unknown proportions.

Clark distributed documents to enable his audience to download and redistribute violent messaging and content.  As noted above, the distribution of propaganda and attack training materials has real-world implications; the same materials Clark distributed have been found in the possession of terrorists like Ahmad Khan Rahimi, who committed bombing attacks in New York and New Jersey in 2016.  Clark's training materials ranged from highly detailed descriptions for the assemblage of bombs and other incendiary devices and the technical aspects of chemical and biological weapons to more prosaic descriptions of "lone wolf" knife and vehicle-borne attacks. Such attacks, committed by ISIS supporters, have killed and injured civilians around the world and in New York City.[16]  Clark's affinity for "lone wolf" attacks, demonstrated by his creation and distribution of graphics calling for such attacks, extended to tattooing an symbol of the "lone wolf" attack on his hand.  His lies to law enforcement regarding the tattoo further underscore the image's continued significance to him even after his arrest.

---

[16] Dozens of such attacks have included (1) November 2015 shootings and bombings in Paris, France, killing approximately 130 people; (2) December 2015 shootings and bombings in San Bernardino, California, killing approximately 14 people; (3) March 2016 bombing in Brussels, Belgium, killing approximately 30 people; (4) June 2016 shootings in Orlando, Florida, killing approximately 49 people; (5) a July 2016 truck attack in Nice, France, killing approximately 86 people and injuring approximately 458 others; (6) a December 2016 truck attack in Berlin, Germany, killing approximately 11 people and injuring approximately 56 others; (7) a May 2017 bombing in Manchester, England, killing approximately 23 people and injuring approximately 139 more; (8) a June 2017 truck attack in London, England, killing approximately eight people and injuring approximately 48 others; (9) an August 2017 attack in Barcelona and Cambris, Spain, killing approximately 31 people and injuring approximately 136 others; (10) an October 2017 truck attack in New York, New York, killing approximately 8 people and injuring approximately 11 others.

The defendant's submission identifies at least two points with respect to Clark's conduct—that he did not create content and that he voluntarily stopped posting content months before his arrest—that it argues mitigate the defendant's conduct, but the evidence in this case shows both claims are untrue. Def. Mem. at 6.  As discussed in detail above, Clark not only discussed his creation of ISIS propaganda with the CSes and UCs, he also outlined his awareness of the steps he needed to take to remove metadata from images to mask their origin, recommended editing programs to others, and discussed his ability to create content as one of the skills he could offer ISIS.   While the Government recognizes that the majority of the attack, tactical, or weaponry training materials he distributed originated elsewhere, he both created and distribute content advocating violent attacks.  In addition to images in the Complaint, examples of graphics Clark created include the depictions below, pointedly referencing and calling for attacks in the New York City Subway system and mocking the efforts of law enforcement to prevent or detect attacks:

 

Clark's graphics further offered chilling warnings of impending attacks and visions of a New York decimated by ISIS's efforts, including depictions such as the below left, warning of attacks in New York City subways, and the below right, featuring a decapitated Statue of Liberty raising ISIS's flag over a burning New York City skyline:

 

Clark also created an image of a street intersection, located several blocks from the Brooklyn residence where he was later arrested, over which he superimposed a reference to ISIS's calls for attacks in the United States and other Western cities, and a reference to one of the channels for which he was an administrator, as depicted below:



Moreover, as outlined above, far from ceasing *months* prior to his arrest, the defendant's conduct in fact continued through the month of his arrest.  In addition to his continuous content posting, the defendant affirmed his loyalty to ISIS in a second *bayat* video following the death of al-Baghdadi less than a month prior to his arrest and called on other ISIS followers located in "the land of the kuffar" to privately message him.  Relatedly, Clark's brazen antipathy toward law enforcement appeared to increase over time, as in November 2019, Clark broke away from his family and ran toward a vehicle which contained a member of law enforcement surveilling Clark.

Clark was fully committed to advancing ISIS's mission of violence, death, and destruction through the time of his arrest.  He twice pledged *bayat*, offering his life to ISIS, and reaffirmed his commitment to the organization less than a month prior to his arrest.  Although Clark suggests that the seriousness of his conduct is diminished because he did not attempt to travel overseas or acquire

bombmaking supplies in anticipation of an attack, this ignores Clark's fulfillment one of ISIS's core mission roles by extensively distributing propaganda and attack materials on behalf of ISIS, and it is unlikely that the full impact of his conduct can ever be calculated.  What is known, however, is that for months Clark sent messages to hundreds of ISIS adherents urging attacks on civilians and showing them how to do it.  Clark did not stop his conduct for any reason other than his arrest by law enforcement.  His efforts to cast his offenses as minimal in the scope of terrorism offenses badly mischaracterize the seriousness of his offenses, ignore their value to ISIS's mission of global terror, and fail to fully reckon with his responsibility and role in the crime.

### B. A Guidelines Sentence Is Necessary to Protect the Public from Further Terrorism Crimes Committed by Clark

The need to protect the public from further crimes of this defendant, *see* 18 U.S.C. § 3553(a)(2)(C), is a paramount consideration here, and strongly supports the imposition of a Guidelines sentence.  Terrorism crimes come with high recidivism rates and the rehabilitation of terrorism defendants like Clark is notoriously difficult.  *See Meskini*, 319 F.3d at 91-92 (noting the link between "the difficulty of deterring and rehabilitating" terrorism defendants and the conclusion that "terrorists and their supporters should be incapacitated for a longer period of time").  Clark's absolute commitment to ISIS and the radical Islamic terrorist ideology that it espouses, his aspiration to commit the ultimate sacrifice, to martyr himself for ISIS and its cause, and his efforts to inspire others to commit themselves to ISIS and conduct attacks in the very city where he and his family resided all powerfully support a single conclusion: the incapacitation of Clark should be for the full term of 240 months permitted by statute and called for by the Guidelines.

Not surprisingly, Clark now claims that he has been rehabilitated and de-radicalized. *See, e.g.*, Def. Mem. at 12.  The defense submission cites the defendant's purported attachment to his family in support of that claim. *See, e.g.*, *id.* at 12, 13.  The argument rings hollow.  Clark's radical ideas permeated his home life and extended to his own efforts to radicalize members of his family, including his young son.  Although Clark's girlfriend claimed in her letter that she would "never allow [support of ISIS] around my children or myself, and Zachary [Clark] has never spoken of these things to us," the images and text messages from her own phone, referenced above, demonstrate quite the opposite.  PSR ¶ 80, Def. Mem. Exhibit D at 1.

In fact, Clark's girlfriend's messages demonstrate her clear awareness of his radicalization.  For example, on or about December 31, 2018, Clark's girlfriend criticized Clark, writing, "Complain about everyone and meanwhile all you do is sit there watching isis videos."  Later, on or about February 12, 2019, Clark's girlfriend wrote to Clark, "Join isis if you'd like."  Clark's girlfriend's phone contained ISIS propaganda, approximately 20 images of Clark gesturing with a single finger raised—the well-known symbol indicative of support for ISIS.  Her phone also contained approximately a dozen images of Clark with their approximately 1-year old son, an example of which is depicted above, in which Clark appears to be displaying the "one-state" gesture while manipulating the child's hand in the same pose.  Clark made ISIS part of his domestic life and sought to radicalize his family.

In the Forensic Evaluation Report prepared for the defense by Dr. Katsavdakis (Def. Mem. Exhibit A) Clark made numerous statements which grossly minimize his behavior during the commission of the offense and suggest he does not consider his conduct to have been serious.  For example, although he had already pleaded guilty to providing material support to ISIS, Clark

dismissively described charges in this case as "trumped up." Def. Mem. Exhibit A at 4.   Clark "adamantly repeated that he was not planning to carry out an attack," and claimed he stopped using the encrypted application to post in support of ISIS by in or about September 2019. *Id*.   Clark even went so far as to "den[y] disseminating bomb making material." *Id*. at 5.

These claims are not credible.   Clark's postings on the encrypted application did not end in September 2019, although Clark had become increasingly worried about law enforcement scrutiny.   From on or about October 15 to October 21, 2019, Clark explained to CS-3 that, "I was being followed before phone change now I'm not as of late."   When CS-3 replied by explaining that other ISIS supporters had been arrested, Clark answered, "yea it's crazy and we just need better safety set in place I suggest we abandon [the encrypted application] all together / you and me bro / and we start something big elsewhere […] I know where I'm at and this kuffar outta control / they can't get best of us no matter what akhi."   However, in other postings using the encrypted application made on or about November 1, 2019, Clark pledged *bayat* to ISIS's new leader, and later posted a message on the encrypted application calling for others to contact him if they supported ISIS and lived in the United States.

Clark's outright denial of distributing bomb-making materials is alarming and is among many indicators of his failure to fully accept responsibility in this case.   As the defendant's own report indicates, Clark in fact posted significant quantities of bomb making materials, including manuals such as, "Making Explosives for Homemade Blasting," "Lone Wolf ETN" (ETN is an abbreviation for erythritol tetranitrates, substances that can be used as components of a bomb or explosives), and "Four Easy Ways of Making an Explosive Belts." *Id.* at 4.   Though Clark may not have distributed the physical components of a bomb, he provided hundreds of ISIS supporters

highly detailed and technical roadmaps to enable them to build bombs from widely available household items. Clark conceded only that with respect to his postings on the encrypted application that he "should have been more responsible." *Id*. Clark's own analysis of his support for ISIS concluded that he had "no specific grievance, beyond the perception that "ISIS was treated unfairly [...]" Clark then attempted to link his behavior to "dissatisf[action] with the government, maybe how they handled the thing, racism and oppression." *Id*. at 10. Additionally, Clark claimed that with respect to his postings, he knew that followers were "talking, but I didn't believe that one would follow through." *Id*.

In spite of Clark's evasive answers, denials of responsibility, and outright untruths regarding his conduct, the defense report concludes that Clark poses "a low risk for terrorist targeted violence." *Id*. at 12. The Government respectfully submits this Court should reject the report's conclusions for the report's failure to reckon with Clark's misstatements and minimizations. Rather than accurately recounting his involvement in the offenses, Clark lied about his having perpetrated them despite clear evidence to the contrary, claimed he voluntarily withdrew although he demonstrably had not, and provided answers that appear to have been designed to mask his continued support for ISIS.

Clark was in no way disengaged from ISIS's mission of violence or unaware of the purpose of his postings; in addition to the vast library of violence he self-published or passed along to his followers, he discussed ISIS's goals at length with over a dozen CSes and UCs and carefully analyzed ISIS's actions within the scope of radical Islamic ideology and ISIS. Clark committed himself to religion and language study to better understand the subject matter, and dug deep into the ideals of the organization in his posts and direct communications. Searches of Clark's devices

after his arrest showed that for months Clark consistently researched jihad, ISIS, other terrorist organizations, radical Islam, and pored over forums filled with ISIS propaganda.  Clark's claim that he "passively posted, not looking at it, not reviewing what I posted" is a clear lie.  *Id.* at 11. Moreover, though Clark states that he "did not write [his] own material," Clark discussed his content creation with both CSes and UCes throughout the investigation.  *Id.* Clark's vague suggestions that he was generally frustrated with the United States Government and the unfair treatment of ISIS, or that he did not believe anyone would follow through in response to his postings, are facially absurd in the face of the actual content Clark produced and disseminated and the chats he maintained throughout the course of the investigation.  *Id.* at 10.

Clark's own criminal history also points to his high risk of recidivism.  The defendant's criminal history includes convictions for burglary and robbery.   PSR ¶ 98, 100.  In 2003, the defendant committed several offenses over a several day period, including entering an apartment and stealing property, entering a business and stealing a cash register, and robbing another business by threatening the store worker at knifepoint.  The defendant was convicted of multiple felonies for these offenses, and served six years in prison.  *Id.*  Prison terms also followed subsequent convictions for petit larceny.  *Id.* ¶ 101-103.  The defendant's post-release supervision was uneven; during his last term of probation, a warrant was issued for the defendant's arrest in relation to a violation in January 2017.  *Id.*  Although the defendant turned himself in after the warrant was issued, the defendant did not reappear for court.  *Id.*  Despite prior court intervention and periods of correctional supervision, the defendant was not dissuaded by the prospect of returning to prison, and engaged in increasingly severe offense conduct, as evidenced in this case.

Clark claims he no longer poses a threat, but his dissembling in recounting his conduct and identifying his motivations tell the true story.  Based on his conduct, his proven history of recidivism, his persistence in minimizing his full-blown support of ISIS, and the unreliable narratives provided by those closest to him, there is every reason to believe that he would seek to resume his support for ISIS or another group espousing the violent ideology he previously embraced, adopted, and widely promoted.  The need to deter and prevent Clark from doing so overwhelmingly militates in favor of a Guidelines sentence.

### C. A Guidelines Sentence Will Avoid Creating Unwarranted Sentence Disparities

A Guidelines sentence in this case is reasonable and warranted in order to avoid creating sentencing disparities across comparable terrorism cases.  Though defense counsel argues in favor of a sharp variance, the cases cited by counsel in support of one are distinguishable from Clark's. As a general matter, counsel suggests that a defendant's willingness to travel creates a bright line distinction denoting Clark's comparably less serious conduct.  But this suggestion is undermined by the propaganda and materials Clark disseminated in support of "lone wolf" attacks designed to occur in the United States.  Indeed, when Clark discussed traveling with CS-2, he suggested that if he wished to have traveled to join ISIS's fight overseas in 2014, at the peak of Caliphate's territorial gains.

By the time Clark was posting, however, ISIS's territorial gains had been greatly diminished, primarily as a result of Western-led military intervention.  Clark's involvement came at a time where ISIS's attention had shifted from the gathering of fighters drawn worldwide to ISIS's cause in the Middle East, to a focus on identifying and radicalizing sympathizers to commit attacks where they found themselves.  For example, in or about December 2016, an ISIS

spokesman encouraged ISIS supporters to "attack them in their homes, markets, streets, clubs, and wherever they least expect it," "[e]nflame the ground beneath their feet and blacken their skies so that they are busied with themselves," and "[m]ultiply your efforts and intensify your operations, may God bless you."[17]  In or about April 2017, the same spokesman, stated in a speech, "O honest monotheists in America, Russia, and Europe, O supporters of the caliphate! O ye who failed to join the battlefield and today you are bound by the directives of the infidels. Have a sense of urgency and be sincere about what you seek. Know that our war against our enemy is a comprehensive war, and the enemy's interests are easy to grab. So, target them at home and away from your caliphate and the home of Islam."[18]  Clark's private discussions, propaganda and training materials and manuals, and even his tattoos specifically embraced this *modus operandi*. In effect, comparing Clark's conduct to that of individuals who discussed traveling in support of ISIS in years past misses the point.  Clark served some of ISIS's most pernicious mission priorities as they existed in 2019, which included a clear emphasis on conducting attacks in supporters' home cities, which is precisely what Clark promoted most vocally.

The cases cited by the defendant are thus easily distinguishable.  For example, in *United States v. Caesar*, 388 F. Supp. 3d 194 (E.D.N.Y. 2019), *appeal filed* (19-2881), although the defendant posted messages supporting ISIS on social media, her online expressions of support for

---

[17] "*Berlin Attack Echoes ISIS Propaganda Shift*," Wall Street Journal, December 23, 2016, https://www.wsj.com/articles/berlin-attack-echoes-isis-propaganda-shift-1482515796  (Retrieved May 5, 2021).

[18] "*ISIS Officially Taunts Trump, Ending a Conspicuous Silence*," New York Times, April 4, 2017, https://www.nytimes.com/2017/04/04/world/middleeast/trump-isis-taunt-idiot.html     (Retrieved May 5, 2021).

ISIS chiefly included messages praising particular attacks conducted in the name of ISIS and generally lauding ISIS's mission.  Though the defendant in *Caesar* also created ISIS propaganda, there was no evidence that she disseminated attack manuals or bomb-making materials, as Clark did, or that she created or administered channels.  She did use an encrypted application to communicate with ISIS supporters and engage in one-on-one recruitment efforts, but to the extent she utilized those channels to engage in her offense conduct, her position is notable; *i.e.*, she was one user in a channel communicating directly with other users, whereas Clark managed and/or created over a dozen channels that acted as marketplaces for ISIS's violent ideology and meeting places for defendants like that in *Caesar*.

The defendants in *United States v. Asher Abid Khan*, No. 15 Cr. 263 (S.D. Tex. 2019), *United States v. Islam Said Natsheh*, No. 16 Cr. 166 (N.D. Cal. 2016), and *United States v. Aaron T. Daniels*, No. 16 Cr. 222 (S.D. Ohio 2018) all engaged in travel-related offenses in or before 2015.  In *Natsheh*, the defendant posted a number of ISIS-related materials on his own Facebook and Twitter accounts and extolled ISIS's violence before attempting to travel himself; and in *Khan* and *Daniels*, the defendants engaged predominantly in one-on-one communications with others they understood to be ISIS supporters using Facebook.  Simply put, the defendants' conduct in those cases in no way resembles Clark's.  In *Natsheh*, *Khan*, and *Daniels*, the defendants demonstrated their commitment to ISIS by traveling or attempting to travel to join ISIS's fight abroad.  Although they posted or communicated with others on well-known social media platforms regarding their support of ISIS, Clark's conduct was far more pernicious.  Unlike those defendants, Clark extensively used encrypted email and chat applications and maintained a low profile on social media.  Clark managed channels with hundreds of subscribers and pushed content to them.

41

Where the aforementioned defendants sought to fight on behalf of ISIS abroad, Clark advocated for attacks in the United States and discussed his own plans for attacks in New York City.  Clark evinced his lifelong commitment to "lone wolf" attacks with one tattoo, and to distributing propaganda for ISIS with another.  Clark sought to radicalize his family, including his young son. In sum, those defendants committed their offenses in a manner totally distinct from Clark's, and Clark's conduct is not fairly comparable to theirs.

The defendant's cases also serve to highlight the dangerousness of Clark's conduct, insofar as they prove the ways in which online communications are key to ISIS's recruitment and engagement efforts.  Where the above defendants by and large used their personal social media profiles to engage with others they believed to be, or who were in fact, members of ISIS in one-on-one exchanges, Clark created, maintained, and promoted over a dozen channels where hundreds of like-minded supporters could gather from anywhere in the world in an encrypted environment. Clark's channels were thus not only repositories of attack training materials and propaganda disseminated by the defendant, they were gathering places for violent extremists and those vulnerable to radicalization, who may otherwise have found no clearinghouse for violent ideology as the defendant provided.

The defendants in the cases cited by Clark above are also distinguishable because, unlike them, Clark has recidivated on six prior occasions, with a criminal history that includes armed robbery.  The offense conduct in each of the above-cited cases notwithstanding, the defendants were typically very young, and had not yet demonstrated, as has the defendant, that numerous prior contacts with the criminal justice system, including significant prison terms, had done little to dissuade their criminal behavior.  While it is undisputed that Clark's prior conduct was unrelated

to terrorism, Clark has time and again demonstrated his inability to live by the rules of society. Indeed, despite his age, he has had no significant or sustained employment his entire adult life. The defendant essentially concedes that only when monitored by the courts has the defendant maintained any relative period of stability.  The defendant's age and criminal history—and, of course, his conduct—provide little reason to believe that the defendant's contempt for society has done anything more than metastasize to the point of extreme violence and incitement of others to the same.  The defendant has not demonstrated that he is rehabilitated or likely to rehabilitate.  The defendant is thus unlike those in the above-mentioned cases, which collectively and alone have no bearing on the appropriate sentence in this case.

### D. A Guidelines Sentence Is Necessary To Afford Adequate Deterrence and To Promote Respect for the Law

A Guidelines sentence is also necessary in order to adequately deter criminal conduct—in this case, terrorism aimed at harming Americans and American interests—and to promote the law prohibiting such destructive conduct.  *See* 18 U.S.C. § 3553(a)(2)(A)-(B).  As Judge Walker stated in his concurrence in *Stewart*, "[i]n no area can the need for adequate deterrence be greater than in terrorism cases, with their potential for devastating loss of innocent life."  *Stewart*, 590 F.3d at 181.

The capacity of a terrorist organization like ISIS to thrive hinges in large part on its ability to grow its membership—to attract, indoctrinate, and enlist new followers.  Clark embraced this role to the fullest, and was committed to advancing and serving ISIS's murderous agenda and helping others to do the same.  This support helps ISIS and other terrorist groups to fulfill their missions of hate, murder, and violence.  Although Clark created some of the propaganda he

distributed, publication and promulgation of these materials made them even more dangerous.  For example, a bomb-making guide delivered to hundreds of terrorism supporters gathered together and coupled with entreaties to fulfill revenge-fueled missions of holy vengeance is far more dangerous than any such guide found in isolation on the web.  The defendant created places in a secure online environment for hatred and violence to flourish unchallenged, encouraged others to kill themselves and others in furtherance of ISIS's mission in New York City, the United States, and elsewhere, and consciously avoided law enforcement and sought to frustrate its aims.  He now claims that despite months of evidence proving to the contrary that he was not particularly motivated by ISIS's ideology, was led astray by others, and did not think anyone would take his message seriously.  Def. Mem. Exhibit A at 4, 10, 11.  A sentence below the Guidelines would risk signaling to others that, in spite of its dangerousness and centrality to modern terrorism, materially supporting terrorism from an online pulpit is not serious conduct.  It is vital for our country's national security that conduct like the defendant's is condemned by the imposition of serious consequences.  A Guidelines sentence is necessary and warranted in this case to serve the pressing need for general deterrence of such terrorism offenses.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the Court should sentence Clark to 240 months' imprisonment and a lifetime term of supervision—the sentence called for by the Guidelines and recommended by the Probation Office—as such a sentence is sufficient but not greater than necessary to comply with the purposes of sentencing pursuant to 18 U.S.C. § 3553(a).

Dated:  New York, New York
        May 5, 2021

                            Respectfully submitted,

                            AUDREY STRAUSS
                            United States Attorney for the
                            Southern District of New York

            By:     _____
                            Matthew Hellman / Gillian Grossman
                            Assistant United States Attorneys
                            212-637-2278 / -2188