L5CsCLAs

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4          v.               20 CR 76 (NRB)

5  ZACHARY CLARK,

6          Defendant.

7  ------------------------------x

8                         New York, N.Y.
                         May 12, 2021
9                         12:00 p.m.

10

11  Before:

12              HON. NAOMI REICE BUCHWALD,

13                             District Judge

14                      APPEARANCES

15  AUDREY STRAUSS
        United States Attorney for the
16        Southern District of New York
  BY:  MATTHEW HELLMAN
17        Assistant United States Attorney

18  FEDERAL DEFENDERS OF NEW YORK
        Attorneys for Defendant
19  BY:  JONATHAN A. MARVINNY

20  ALSO PRESENT:
  COURTNEY BONGIOLATTI, FBI Special Agent
21

22

23

24

25

L5CsCLAs

| | |
|---|---|
| 1 | (Case called) |
| 2 | THE DEPUTY CLERK:  Is the government present and ready |
| 3 | to proceed? |
| 4 | MR. HELLMAN:  Yes.  Good afternoon, your Honor. |
| 5 | Matthew Hellman for the government.  I'm joined at counsel |
| 6 | table by Special Agent Courtney Bongiolatti of the Federal |
| 7 | Bureau of Investigation. |
| 8 | THE DEPUTY CLERK:  Is the defendant present and ready? |
| 9 | MR. MARVINNY:  Yes.  Good afternoon, your Honor. |
| 10 | Federal Defenders of New York by Jonathan Marvinny for Zachary |
| 11 | Clark. |
| 12 | THE COURT:  You may be seated. |
| 13 | All right.  Let me begin, as I customarily do, |
| 14 | by ensuring that I've received all of the submissions in |
| 15 | connection with the sentence.  In sequence, hopefully, first is |
| 16 | the report of the probation department, which has a revised |
| 17 | report date of October 30.  Then there is Mr. Marvinny's |
| 18 | submission, sentencing memorandum, filed on April 28.  Then |
| 19 | there is the government's sentencing memorandum.  It is dated |
| 20 | May 5.  And finally, a letter from Mr. Marvinny in response |
| 21 | dated May 6. |
| 22 | Are there any other documents I should have received |
| 23 | in connection with the sentence? |
| 24 | MR. HELLMAN:  Not from the government. |
| 25 | MR. MARVINNY:  Not from the defense. |

L5CsCLAs

1          THE COURT:  All right.  Can I confirm that both

2      parties have received a copy of the presentence report?

3          MR. HELLMAN:  Yes.

4          MR. MARVINNY:  Yes, your Honor.

5          THE COURT:  Mr. Marvinny, I believe you stated that

6      you have no objections to the presentence report other than a

7      recommended sentence, is that correct?

8          MR. MARVINNY:  That's right.

9          THE COURT:  Did you have a chance to review it with

10     Mr. Clark?

11         MR. MARVINNY:  Yes, I did.

12         THE COURT:  OK.  Thank you.

13         Does the government have any objections to the

14     presentence report?

15         MR. HELLMAN:  Just a correction, I think.

16         THE COURT:  OK.

17         MR. HELLMAN:  I think the parties are aligned on this.

18     At paragraph 107 --

19         THE COURT:  Hold on.  Give me a second.

20         MR. HELLMAN:  Page 21, for your Honor's reference.

21         THE COURT:  OK.

22         MR. HELLMAN:  Paragraph 107 indicates that the

23     criminal history category is VI, which is also the category the

24     parties agree applies.  Turning forward to page 26, at

25     paragraph 143 the report indicates that the criminal history

L5CsCLAs

1    category is IV.

2            Finally, turning to the close of the report, at page

3    30, which is the sentencing recommendation of probation, it is

4    indicated that the criminal history category is IV.

5            The parties agree that the criminal history category

6    that applies is VI, and apparently so does probation.  I think

7    this is a ministerial error, but it does affect not what the

8    functional guidelines range is, but what the guidelines range

9    would be, absent the statutory maximum that applies.

10           THE COURT:  Right.  But given the statutory maximum,

11   the category VI has no impact?

12           MR. HELLMAN:  That's correct, but the guidelines do

13   change.  The guidelines, absent the statutory maximum, are

14   360 to life.  If the criminal history category the parties

15   agree applies is applied, I just wanted to make sure that the

16   PSR accurately reflects the parties and probation's

17   understanding.  Of course, the court will determine --

18           THE COURT:  We will correct that, but I think the most

19   significant point, I mean, apart from the fact, of course, in

20   order to be accurate, is that this is not one of the

21   double-counting situations where the same factor affects both

22   the criminal history and the offense category, because given

23   the particular criminal history of Mr. Clark, there was no

24   bottom-line impact.

25           MR. HELLMAN:  Well, yes, that's correct.  I think the

L5CsCLAs

1  government shares that view.

2          THE COURT:  All right.  I think that, in this

3  situation, it would probably be best to hear from the

4  government first with respect to the appropriate sentence.

5          MR. HELLMAN:  Thank you, Judge.

6          I think the government endeavored in its submission to

7  be complete, and it was a longer-than-average submission, which

8  reflects the government's understanding of the seriousness of

9  this offense.

10          The government submits today, and of course in its

11  submission, that a guidelines sentence of 240 months, to be

12  followed by a period of lifetime supervised release, is

13  appropriate based on the nature and seriousness of the offense,

14  the defendant's criminal history, and both the principles of

15  specific and general deterrence.

16          I won't repeat all the arguments that are laid out in

17  support thereof in the government's submission, but I want to

18  make sure that something is clear.  Mr. Marvinny makes a good

19  point in his reply submission that the way that a piece of the

20  government's sentencing submission is written conflates to

21  important events.

22          One is the defendant's post-arrest admissions to the

23  FBI and the other is, I'll refer to generally, is the

24  defendant's statements to the forensic evaluator, the defense

25  employed in this case.  I think what the government was trying

L5CsCLAs

1    to indicate is that, in both scenarios, both immediately after

2    his arrest and until now apparently, and at least through the

3    period of time that the defendant was speaking with the doctor,

4    the defendant has critically minimized, which may be an

5    understatement, but critically minimized the seriousness of the

6    offense, his role in it, what his conduct meant to an

7    organization like ISIS, what it meant to him personally, and

8    established markers which the government submits are

9    inaccurate.

10        For example, the idea that the defendant stopped

11   posting months --

12        THE COURT:  You know what --

13        MR. HELLMAN:  -- prior to his arrest --

14        THE COURT:  -- by asking you speak first, I just

15   envisioned another presentation.  So maybe we should go back to

16   traditional format, to let Mr. Marvinny speak and then you can

17   respond to him.

18        I'm sorry for having made an assumption of the nature

19   of what the government wanted to say today.  Why don't we let

20   Mr. Marvinny speak and you can respond to him.

21        MR. HELLMAN:  Of course, your Honor.

22        THE COURT:  OK.

23        MR. MARVINNY:  Thank you, your Honor.

24        Your Honor, one thing missing from the entirety of the

25   government's submission was an acknowledgment that at the time

L5CsCLAs

1    of the offense, and in fact for years and years and years

2    leading up to the offense, Mr. Clark was in the midst of

3    terrible mental health issues and terrible struggles with

4    substance abuse.

5            That reality, that context for his behavior, cannot be

6    divorced from what he did.  The government's submission doesn't

7    address at all the state that Mr. Clark was in.

8            Nothing I say here today, nothing I said in my

9    submission, was an attempt to minimize Mr. Clark's offense.

10   The offense is well-known.  The government's initial complaint

11   in this case was 25 pages.  It was detailed.  The PSR is

12   exceptionally detailed, and all of the information reviewed by

13   Dr. Katsavdakis, when he formulated his report, was

14   comprehensive and detailed.  And I'll speak more about that in

15   a moment.

16           No one will minimize what Mr. Clark did.  These are

17   the facts, your Honor.  All of this remains true.  Mr. Clark

18   did not attempt to travel abroad, so he did not travel abroad.

19   He didn't take any substantial steps towards planning an

20   attack.  He didn't surveil locations.  He didn't purchase any

21   weapons.  He didn't purchase any materials to make weapons.  He

22   didn't purchase any materials to make bombs.

23           When the government arrested Mr. Clark and searched

24   his home and searched his storage unit, they didn't find

25   weapons, they didn't find knives, they didn't find guns.  They

L5CsCLAs

1    found homemade ISIS flags and books.  At the end of the day,

2    the government is asking this court to impose a 20-year

3    sentence primarily because of something they think Mr. Clark

4    might have done.  But his actual conduct doesn't merit a

5    sentence anywhere near what the government is asking, your

6    Honor.

7              What he did in the name was organize and administer

8    various ISIS-related channels on these encrypted applications.

9    In those channels, he posted various materials, the majority of

10   which he reposted from the public domain.  He communicated with

11   multiple undercover officers and informants.  And he's accepted

12   responsibility for his actions and the materials he posted and

13   the propaganda he posted in those chat rooms.

14             But Mr. Clark didn't commit an attack, your Honor, and

15   he didn't take steps towards committing an attack.  And so the

16   government is asking the court to assume he was going to commit

17   an attack.  But the best evidence we have is that he wasn't.  I

18   say that again because there were no substantial steps.  There

19   were no materials towards committing an attack.

20             So we had Mr. Clark evaluated by Dr. Katsavdakis, your

21   Honor.  And the way we came to Dr. Katsavdakis was, very early

22   in this case, I had a meeting with the U.S. Attorney's office

23   where I asked them to consider Mr. Clark for some

24   deradicalization program or some kind of treatment program that

25   they feel would be appropriate for him.  My position was if the

L5CsCLAs

defendant was deradicalized, he was not serious about ever

committing attacks, that he was not beyond redemption.

        The government was not interested in placing Mr. Clark

in any deradicalization or any other kind of program, but said

were they to consider it, they would at least want to see an

evaluation.  Who would you like to see an evaluation from?  I

was told that Dr. Katsavdakis was the go-to person for these

kinds of evaluations.

        Dr. Katsavdakis is an expert most frequently retained

by the U.S. Government.  He most frequently works with the

Eastern District of New York.  So we had Dr. Katsavdakis

evaluate Mr. Clark.  Your Honor, this is one point I want to

make absolutely clear.  Dr. Katsavdakis had a complete and

thorough understanding of Mr. Clark's offense.  He didn't rely

on Mr. Clark's words alone when evaluating what Mr. Clark did

and the risks he might pose.  He reviewed the government's

complaint.  He reviewed all of the discovery that had been

provided to us at that point.  He spent hours and hours and

hours and hours reviewing the case materials, including

Mr. Clark's post-arrest statement.

        His account of Mr. Clark's offense, in his report at

pages two through five, his lengthy comprehensive -- and it

doesn't leave out any details -- all of the things the

government points to in its submission as aggravating factors

for Mr. Clark's conduct are represented and accounted for in

L5CsCLAs

1    Dr. Katsavdakis' report.  It's not as if he sat down with

2    Mr. Clark, Mr. Clark minimized his involvement, and

3    Dr. Katsavdakis just took his word for it and said he's a low

4    risk of violence.  That's not the case at all.

5         The court has the report.  Dr. Katsavdakis was well

6    aware of all of Mr. Clark's relevant conduct, and he still

7    reached the conclusion, your Honor, that Mr. Clark poses a low

8    risk of violence.  That's consistent with the fact that

9    Mr. Clark didn't take any real world concrete steps towards

10   committing an act of violence.

11        Dr. Katsavdakis focuses in his report on what I

12   started with, which is Mr. Clark's significant history of

13   mental illness, bipolar disorder, other ailments that started

14   when he was a teenager.  He talks about Mr. Clark's extreme

15   history of substance abuse, a history of substance abuse that

16   I don't believe Dr. Katsavdakis had ever encountered in his

17   career.  Mr. Clark didn't just use drugs from time to time.

18   Mr. Clark was mainlining hard drugs for years and years.  He

19   was injecting them into his body including as late as February

20   of 2019, at the time the offense conduct began in this case.

21        We turned in, in our submission, an excerpt from a

22   record, and Dr. Katsavdakis' certainly reviewed all of

23   Mr. Clark's lengthy substance abuse records, talking about how

24   Mr. Clark was rushed to the hospital after an overdose in

25   February of 2019.  He had swollen lesions on his arms from

L5CsCLAs

injecting heroin.  He reported that he was using 20 bundles of

heroin and three grams of cocaine a day that he was injecting

into himself.  That had been going on for years and years.

This was not the beginning of Mr. Clark's drug

addiction.  This was the culmination of Mr. Clark's lengthy,

lengthy drug addiction.  When I met Mr. Clark, your Honor, in

pretrial services on the day of his arrest, he was nodding off.

He couldn't communicate with me for more than a minute or two

at a time.  He could barely speak.  That was also true in his

post-arrest interview with the FBI, which Dr. Katsavdakis

references.

Mr. Clark was in the depths of a debilitating drug

addiction throughout the offense conduct.  That is not an

excuse.  It is not an excuse, but it is critical context that

can't be ignored, and it speaks to why Dr. Katsavdakis reached

the conclusion that Mr. Clark was not serious about committing

an attack.

So the most comprehensive evidence before the court is

that he was not serious, that he was not going to commit an

attack.  Yet the government is asking you to sentence him

essentially as if he was.  That's a large part of the

government's arguments.

Your Honor, we have talked about comparison cases in

our submission that justify a substantially below guidelines

sentence here.  Most significantly, your Honor, is the

L5CsCLAs

Caesar case from the Eastern District of New York, where

Judge Weinstein imposed 48 months on a defendant.  That

defendant was nearly identically situated to Mr. Clark.  The

government in its submissions attempts to say that Mr. Clark's

conduct is much worse, but there is really no basis for saying

that.

        The defendant in that case uploaded images and videos

supporting ISIS, encouraged people to travel to join ISIS.  She

expressed support for acts of violence and attacks in

furtherance of ISIS's agenda.  She herself communicated with

ISIS supporters who were interested in traveling to

ISIS-controlled territory, and attempted to have at least four

of them travel to ISIS, attempted to assist them.  She also

suffered from mental health issues.  And Dr. Katsavdakis wrote

her report in that case as well.  He was an expert for the

government in that case, and he found she was a higher risk of

violence than he found was Mr. Clark.

        Judge Weinstein imposed 48 months and he said, The

ideal sentence in a case like this would be a rehabilitation

program, some kind of deradicalization program.  Unfortunately,

those programs are few and far between and they don't really

exist.  Nevertheless, he gave her 48 months and placed her on a

lengthy term of supervision.

        We are seeking something similar here for Mr. Clark.

The sentence is justified compared to the Caesar case and other

L5CsCLAs

cases Dr. Katsavdakis talks about, and Dr. Tussy in her report

talks about this as well, how despite Dr. Katsavdakis'

conclusion that Mr. Clark wasn't serious about committing an

attack, he is going to need substantial assistance, treatment,

and structure going forward.

So we're asking the court to place him on a lengthy

term of supervised release.  While on a lengthy term of

supervised release, after his period of imprisonment, his

devices can be monitored, he can be forced to attend inpatient

or any other kind of treatment, he can be subject to the

probation office's watchful eye.  We're not asking here for

time served, but we're asking for a reasonable period of

imprisonment followed by a lengthy period of supervised

release.  I don't think a lifetime period of supervised release

is necessary, but a very lengthy period of supervised release

is necessary.

That's the appropriate sentence, from our perspective,

based on what Mr. Clark did and what he didn't do.  You know,

he's tried during his time at the MCC, and now at the

Westchester County Jail, to avail himself of whatever

rehabilitation programs there are.  He completed a drug

program.  He is now in an anger management program.  It's an

eight-week program.  He began about a week ago.  He is trying

his best to turn his life around, and he wrote a letter to this

court disavailing ISIS, disavailing radical etiology, and

L5CsCLAs

1    telling the court what he wants to do going forward.

2            Your Honor, I'm happy to answer questions, but, again,

3    our position is that a sentence anywhere near the length that

4    the government is requesting would be far greater than

5    necessary based on the facts of what Mr. Clark actually did and

6    what he didn't do.

7            THE COURT:  Thank you.

8            I don't, at this point, have any questions.  I've read

9    through your materials two times, beginning to end.

10           Mr. Hellman -- or maybe Mr. Clark first.  I'm having a

11   little trouble with order today.

12           THE DEFENDANT:  Good afternoon, your Honor.

13           Sitting here listening to all this stuff about myself

14   is not easy.  You know, I have suffered a great deal growing up

15   with substance abuse and violence in my own home and stuff like

16   that.  But I don't -- I don't want that to be confused with an

17   excuse or with -- yes, I may have did this, but this is why.

18           I'm fully aware of my actions.  At no point would I

19   minimize my actions and the effects that they could have

20   possibly had on others as well.  These are things that I have,

21   throughout my incarceration, I've had the time away from the

22   substances, I've had time to get stabilized on my medication,

23   I've had time in programs with therapists, to hash a lot of

24   this stuff out.  And, you know, it really resonates with me the

25   true impact that a lot of this stuff does have as a citizen,

L5CsCLAs

1   as an adult, as a father.

2          To sit here and say -- to try to give you an apology

3   and say "I'm sorry" would be a great understatement.  You know,

4   a lot of stuff happened over there, and I have to hold myself

5   responsible for any part that I would have played in that, even

6   if it was just sitting behind a computer screen or on a cell

7   phone.  And I do.  I want to take full responsibility for my

8   part.

9          And I truly do apologize to the people.  There is

10  really, you know, at the sake of not sounding redundant, you

11  know, it is something that I have to live with every day, and

12  I do try to sort it out in my mind every day.  And if given the

13  opportunity to do it all over again, I wouldn't -- not only

14  would I not do it, I would -- you know, part of my hopes are,

15  upon release, working with some of the youth and helping to

16  deradicalize them and help them to see, you know, the risks

17  involved and the repercussions of their actions.

18          So that's all.  Thank you.

19          THE COURT:  Thank you.

20          Mr. Hellman, you have the floor back.

21          MR. HELLMAN:  Thank you, Judge.

22          So, of course, the government agrees that Mr. Clark

23  did not commit an attack.  If he had, he would have been

24  charged with another crime, if the government had the evidence

25  to substantiate it.

L5CsCLAs

He's being sentenced for providing and attempting to
provide material support to ISIS, and he did.  We don't have to
divine the reasons or guess, because he told sources working
either at the direction of or for the FBI during the
investigation why he was doing it.  Media is my Jihad.
Mr. Clark understood the immense value of propaganda to an
organization like ISIS.  ISIS specifically discusses the value
of propaganda to its organizational missions.

His role was critically important to ISIS.  He had an
understanding of why that mattered to the group, and that in
conducting it, he was -- and through his conduct, he was
engaged in a form of Jihad for ISIS, which in his estimation
and in his conversations was akin to another area of conduct he
actively discussed throughout the course of the investigation,
which is conducting an attack.  Again, his words, a martyrdom
operation.

And to be absolutely clear about what that meant, it
meant conducting an attack in New York City, which would cause
maximum destruction and loss of life and would likely end in
his demise because of the nature of the attack.  These are the
types of attacks that he not only called for, and graphics that
he created and that he redistributed in chat rooms on the
Internet, but also that he posted guides to conduct, detailed
guides, which related to bomb-making in very, very technical
terms which would allow people to create bombs, if they read

L5CsCLAs

them, using household items.  But also knife attacks, truck

attacks, indiscriminate attacks with firearms on dense groups

of population.  He discussed specifically ways in which attacks

could be conducted on the subways in New York Cities, subways

that he used, that his family used.

I mention all of that because I think it is critically

important insight into the defendant's mindset at the time he

was posting this material.  Although he claimed in his

post-arrest and to the doctor who was evaluating him that he

passively posted, did not read 70 percent of the materials that

he distributed, and that he didn't really think that others

would follow through based on his exhortations or the manuals

for how to commit attacks that he was disseminating, he was

calling for attacks on a place where he and his family lived

and worked.

His commitment to ISIS was absolute.  We don't have to

guess at that either.  He pledged allegiance to ISIS twice,

including within a month -- just a few weeks before his arrest.

He recommitted to ISIS the day after he mourned the death of

ISIS's previous leader and promised that there would be

retribution for that person's death.  Retribution specifically

against the United States.

His pledges of allegiance to ISIS, his discussions of

conducting an attack himself, indicate his utter commitment to

this organization.  His fidelity.  He was willing to kill

L5CsCLAs

1    others.  He was willing to risk his family's lives.  He was

2    willing to radicalize members of his family.  He was willing to

3    die himself in order to advance the goals of the organization.

4           It is a miracle that an attack didn't occur in this

5    case.  But it does not withstand scrutiny, I submit, that he

6    was not serious about his calls to action or that he was not

7    serious about inspiring others.  I think Mr. Marvinny used a

8    phrase which is very important, that he didn't do anything in

9    the real world.  The defendant didn't anything in the real

10   world.  The application that he used is the real world.

11          The Internet is the real world.  Hundreds and hundreds

12   of ISIS supporters and followers, or even people who are just

13   interested in ISIS, were exposed to content that the defendant

14   collected and disseminated.  Was a lot of it already in what is

15   referred to as the public domain?  Sure.  But the defendant

16   functionally created encrypted clearinghouses where people

17   could freely access these documents and paired them with calls

18   for attacks, which contextualizes both the calls for attacks

19   and contextualizes the manuals themselves in ways that are

20   critical to ISIS's mission.

21          He's pled guilty to that offense.  The government is

22   not trying to suggest that he committed another separate

23   offense, but that the offense he did, in fact, commit is

24   serious enough to warrant a guideline sentence.  The comparison

25   to Caesar is important.  What the government points out and

L5CsCLAs

what I tried to point out in the submission is, yes, <u>Caesar</u> did

use online forums.  The order of magnitude is totally

different.

In terms of the postings that Mr. Clark made, in terms

of the channels that he either created, maintained, or brought

back to life, if they had already been dismantled by law

enforcement, they are not even in the same category.  Posting

information on Facebook or Twitter or Instagram, which is

publicly accessible or engaging in one-on-one communications

with others using those platforms, is simply not akin to the

defendant's conduct in this case.

I think that I need to spend a little time addressing

the doctor's report, because the point I've been trying to make

is that the doctor's report is only as good as the input.  I

understand that the doctor explains that he reviewed materials

and he sets out a lengthy background section to his report.

But I submit, again, that Clark did minimize his conduct when

he was speaking with the doctor.  He explained -- this is a

quote -- he was thinking that a lot of stuff was harmless and

not follow through on be an attack.  He did not read through

withdrew 70 percent of what he posted.  He intended to generate

noise.  That is the truth.  But my behavior is not OK.  I never

had a plan to attack anyone.  He also said that while he was --

when he was pressed on whether his material could incite

violence, he replied yes.  I could see how people are

L5CsCLAs

1   impressionistic.

2          You don't just have to look at the statements and ask

3   ourselves, does that square with his conduct?  At the time he

4   was posting, he explained to others why he was posting these

5   materials.  And his explanation was, This is my Jihad.  I'm

6   supporting ISIS.  This is to inspire others to commit attacks

7   and give them the means to do so.

8          Later he described his decision-making regarding the

9   posts as poor or the worst, but explains that he had a change

10   of heart and snapped back to reality, meaning prior to his

11   arrest.  That is simply false.  He was continuing to support

12   and even pledged his life to ISIS within weeks of his arrest.

13          The doctor's conclusions include the sum which the

14   government takes exceptional issue with.  For example, the

15   doctor says that he may view, if any, sophisticated attempt to

16   disguise his digital footprints.  It's nonsensical.  He used

17   encrypted applications.  He switched applications constantly.

18   He spoke with many, including CSs and UCs, about how to hide

19   from law enforcement.  He never used his real identity.  He

20   never used open-source applications, like Gmail or Facebook, as

21   some of the other individuals in other cases cited by the

22   defense did.  He used encrypted platforms because he was aware

23   of law enforcement's scrutiny and he hoped to evade it.

24          Later, the doctor writes the defendant's ability to

25   carry out an actual attack was limited as his history is

L5CsCLAs

replete with examples of being incapable of accomplishing basic

tasks.  That claim is undermined by his actual conduct in the

case in administering dozens of chat rooms and distributing

these materials and successfully hiding his digital footprint

for such a long period of time.

It is also valuable, I think, to note that basic

skills are all that is necessary to complete many of the

attacks the defendant called for.  It doesn't take exceptional

skill to drive a truck into a crowd of people or to stab

individuals at random in a subway platform, while it is perhaps

correct that some of the bomb-making materials required a more

advanced understanding of material science and bomb making in

general.  Many of the attacks the defendant sought were attacks

that could be committed by everyday individuals with access to

household items.  It is simply not difficult to conduct a lone

wolf attack in many of the ways the defendant suggested.

I think, importantly, the doctor says he continues to

exhibit a minimal understanding into what led him to seek out

and distribute extremist material.  I submit that the defendant

has never truly reckoned with his conduct here.  He has not

offered anything approaching an appropriate explanation for his

conduct.  There is a murky history of radicalization.  We don't

know exactly when it happened.  He hasn't totally explained

that, but sometime in the months before the offense conduct

began, and then a complete denial several months before he was

L5CsCLAs

1    arrested, he was no longer interested in this conduct.

2            That's belied by the evidence, but I think it also

3    relates to another point which has been made, which is about

4    the depths of his addiction.  It would appear that over decades

5    of addictive behavior and recidivating, which by the way the

6    prior crimes certainly fit into a pattern of drug-seeking

7    behavior; petty larcenies, burglaries, driving under the

8    influence.  Even the robberies for petty cash can be lain at

9    the feet of an addiction.  This crime, the crime of conviction

10   here today is simply of a different category.  But what is

11   notable is that his ability to conduct his behavior in this

12   case appears to have -- appears in the middle of his addiction,

13   which was all consuming, but he was also able to engage in the

14   conduct that happened here.

15           The point that the government has now made too many

16   times is clear.  I don't think that the reports are helpful in

17   explaining Mr. Clark's motivations or his continued beliefs or

18   his dangerousness.  Because Mr. Clark hasn't fully reckoned

19   with those things himself or adequately explained them.  The

20   mini incarcerations are important and are not wrestled with in

21   the government's opinion suitably in the expert's report.

22           The conduct that was committed in this case is

23   extraordinarily serious, and the damage that it did is as yet

24   unknown.  We don't know who is radicalized by this, by the

25   materials the defendant created and disseminated, and we don't

L5CsCLAs

1    know who still possesses the materials that he disseminated,

2    which could enable them to commit an attack today, tomorrow, or

3    in the future.

4         Because the defendant has not adequately come to grips

5    with his conduct, the government submits that incapacitation is

6    appropriate here, which is part of the reason, among others,

7    that it requests a 240-month sentence, comporting with the

8    guidelines and for a period of lifetime supervised release.

9         If there are any questions?

10        THE COURT:  No.

11        MR. HELLMAN:  Thank you.

12        THE COURT:  Mr. Marvinny, anything further?

13        MR. MARVINNY:  Your Honor, at the risk of beating a

14   dead horse, I come back to just a fundamental disagreement with

15   Mr. Hellman's reading of Dr. Katsavdakis' report.

16        The aggravating factors are in there.  Dr. Katsavdakis

17   goes through them at length.  He was under no illusions about

18   what Mr. Clark did.

19        THE COURT:  I agree with you.

20        MR. MARVINNY:  Lastly, I'll just say, your Honor, the

21   government keeps saying we don't know who is radicalized by

22   Mr. Clark's postings.  We don't know what could have happened.

23   We don't know.  Sure, that is true.  In a broad sense, sure.

24   You can imagine a parade of terribles, and I don't minimize

25   that at all, of course.  But he still has to be sentenced for

L5CsCLAs

<table>
<tr><td>1</td><td>what he did, not for some abstract idea of what he might have</td></tr>
<tr><td>2</td><td>done, or because he did things that are distasteful, that make</td></tr>
<tr><td>3</td><td>him look really bad as a person.  It is still about his offense</td></tr>
<tr><td>4</td><td>conduct and what he actually did.  And Dr. Katsavdakis' report</td></tr>
<tr><td>5</td><td>is really the best evidence we have looking forward as to what</td></tr>
<tr><td>6</td><td>he would have or would have not done.</td></tr>
<tr><td>7</td><td>So the government's speculation --</td></tr>
<tr><td>8</td><td>THE COURT:  Well, actually, the doctor's evaluation is</td></tr>
<tr><td>9</td><td>not that he would not go back and commit the crime that he has</td></tr>
<tr><td>10</td><td>been charged with and will be sentenced for today.  He says,</td></tr>
<tr><td>11</td><td>more specifically, that Mr. Clark poses a low threat for</td></tr>
<tr><td>12</td><td>further terrorist targeted violence.  He himself may never</td></tr>
<tr><td>13</td><td>personally commit a violent act, but he is not being sentenced</td></tr>
<tr><td>14</td><td>for having committed a violent act.  He is being charged and</td></tr>
<tr><td>15</td><td>sentenced for providing assistance, which he did.  He certainly</td></tr>
<tr><td>16</td><td>expressed a willingness to commit a violent act, but he said</td></tr>
<tr><td>17</td><td>over and over again, I need some help.  I need some material.</td></tr>
<tr><td>18</td><td>I need some money.</td></tr>
<tr><td>19</td><td>The way I read that is not that he had no intention or</td></tr>
<tr><td>20</td><td>no willingness to commit a violent act.  He simply didn't have</td></tr>
<tr><td>21</td><td>the means, which might be understandable, given that he was</td></tr>
<tr><td>22</td><td>spending all of his money on drugs and alcohol, so ...</td></tr>
<tr><td>23</td><td>MR. MARVINNY:  Fair enough, your Honor.  All good</td></tr>
<tr><td>24</td><td>points.</td></tr>
<tr><td>25</td><td>We are acknowledging that Mr. Clark is being sentenced</td></tr>
</table>

L5CsCLAs

1    for what he did.  Of course, the court is right.  He posted

2    propaganda, he posted attack-training materials, he posted all

3    sorts of things in the forums, and he should be sentenced for

4    that, and I understand that is what the court is going to do.

5    We haven't asked for anything different.

6              There is simply no doubt, though, that a large chunk

7    of the government's argument relates to its insistence that

8    Mr. Clark was going to commit an attack.  What I am saying is

9    simply that Dr. Katsavdakis' findings to the contrary should be

10   afforded more weight than the government's speculation.

11             And when comparing what Mr. Clark actually did to

12   these other material support cases, that is why I'm saying that

13   his conduct falls towards the very bottom of the end of the

14   range of material support cases.  In these other cases where

15   defendants received the sentences we cited in our papers, they

16   attempted to travel abroad or they attempted to help people

17   travel abroad.  So their conduct in furthering ISIS's agenda is

18   at least as serious as Mr. Clark's, but we think they are

19   relevant comparators because they show that, even for

20   defendants convicted of what Mr. Clark did, a sentence far

21   below the guidelines range is appropriate, as numerous other

22   courts is found.

23             We ask that he be compared to those defendants and

24   receive a sentence somewhere in that range, not that he get a

25   slap on the wrist or commended for not committing an attack.

L5CsCLAs

1    Just that he be sentenced for what he actually did, and that

2    it will be proportional to what other defendants who have done

3    other things and even worse things have received.

4              THE COURT:  OK.  The fundamental predicates upon which

5    to determine the appropriate sentence in this case are not in

6    dispute.  While the parties evaluate the significance of the

7    defendant's conduct differently, the acts and actions of the

8    defendant are not disputed.  Indeed, they could not be, as they

9    were memorialized on the Internet chat forums and channels that

10   Mr. Clark utilized and created.

11             Also, there is no objection to the PSR, other than its

12   sentencing recommendation of 240 months.  Nor is there any

13   dispute that the guidelines to be applied in the case are

14   240 months, which is the statutory maximum.  Absent the

15   statutory maximum, the guidelines are higher.

16             The government in its sentencing memorandum, and again

17   today, has described in considerable detail the actions of the

18   defendant which led to his indictment for providing and

19   attempting to provide material support and resources to a

20   designated foreign terrorist organization; in this case ISIS.

21   I have no intention of repeating the government's summary and

22   the defendant's conduct, but I do wish to highlight a few

23   aspects of Mr. Clark's conduct.

24             Mr. Clark utilized and ran numerous Internet channels,

25   some encrypted, to disseminate propaganda and ISIS-related

L5CsCLAs

material, including detailed bomb-making and attack-training

materials.  These materials were the real deal.  Mr. Clark

twice pledged allegiance to ISIS.  Mr. Clark promoted lone wolf

attacks and had a wolf tattoo and LW tattooed on his hand.  The

defendant's activities commenced in March of 2019 and continued

through his arrest in November 2019.  And Mr. Clark expressed a

willingness to die for the cause.

Defendant's counsel has advanced several arguments as

to why, in their view, Mr. Clark should receive a sentence

substantially below the guidelines range.  Let me respond and

discuss each of them.

Defendant's first argument is that Mr. Clark did not

personally engage in an act of violence and specifically that

he didn't travel abroad.  I assume that at least part of the

reason for this argument is to try to persuade me that

Mr. Clark was not really serious.  Indisputably, Mr. Clark

stressed a willingness and eagerness to engage in violent and

destructive acts in his home City of New York, stirring an

interest in committing violence overseas in favor of homegrown

lone-wolf attacks.

Finally, in this regard, I fail to see why this focus

on his own country and fellow citizens should provide any

comfort or reason to depart.

Mr. Clark was 40 years old when he was actively

engaged in these activities.  He was open with his family about

L5CsCLAs

1    his views.  There is no reason not to take his stated

2    intentions seriously.  He repeatedly asked for resources to

3    help him, to enable him to act.

4         Second, the defense attempts to explain Mr. Clark's

5    conduct by focusing on his traumatic childhood, substance

6    abuse, and mental illness.  Regardless of those aspects of

7    Mr. Clark's background, by the time you reach the age of 40

8    and engage in sustained unlawful conduct, you must take

9    responsibility.  It is also noteworthy that Mr. Clark did

10   receive, over decades, various types of counseling, even from

11   a fairly early age.  Unfortunately, Mr. Clark did not take

12   advantage of the help he was offered.  For example, as

13   defendant's submission acknowledges, and I quote, "almost

14   immediately after his probation supervision ended in 2013, he

15   relapsed into heavy drug use."Thereafter, there was no

16   sustained period of sobriety.

17        Third, a threat assessment expert opined that

18   Mr. Clark poses a "low risk for terrorist targeted violence."

19   While I am not sure exactly what this very circumscribed

20   comment covers, that same psychologist also opined, and I

21   quote, "Mr. Clark's management in the community at the time of

22   release will be a significantly difficult and long-term

23   endeavor.  He will unlikely be able to care for himself and

24   will require, in this examiner's opinion, long-term

25   rehabilitation, housing, and probation supervision."

L5CsCLAs

1        The same doctor explained, "While the defendant

2   reported remorse for his behaviors/decisions, he continues to

3   exhibit a minimal understanding into what led him to seek out

4   and distribute extremist materials."  So Mr. Clark is somewhat

5   parallel to a defendant who joins a gang for a sense of

6   belonging and family.  That defendant is not excused for the

7   crime he commits as a gang member.

8        Fourth, there is the assertion that Mr. Clark is

9   remorseful and no longer radicalized.  I took Mr. Clark's plea,

10  and I have read his letter in connection with his sentencing.

11  At his plea, he said just the following in response to the

12  question, Tell me in your own words what you did or some

13  version of that.  He said, "I would say probably around 2019 or

14  so, I knowingly did provide, create" -- note the word 'create'

15  which means that there was original material -- "distribute

16  propaganda on social media for an organization at the time

17  I knew had prior engagement to terrorism.  A majority of the

18  stuff took place while I was in the Bronx and my conduct was

19  wrong and illegal.  So I take accountability for that

20  ownership.  I do apologize to the people." That about sums it

21  up.

22        Frankly, what comes across to me is not an

23  appreciation of how seriously wrong it is to want to assist a

24  foreign terrorist organization to attack your own countrymen,

25  but rather regret that he was caught and regret that he is

L5CsCLAs

1    facing a long stretch in jail.

2          All right.  So let's turn to the 3553(a) factors.

3    First, the seriousness of the offense.

4          I don't think it can be disputed that this is a

5    serious offense, especially since Mr. Clark's preferred target

6    was local and directed to American citizens.  Recruitment and

7    the spread of information, indeed, repetition is terribly

8    important.  That is how the big lie spreads, by repetition.

9    And lone-wolf attacks are indisputably supportive of ISIS.  As

10   I noted earlier, Mr. Clark pled guilty to creating conduct.

11          Then there is the next.  There is the issue of

12   deterrence.  Here, prior contact with the criminal justice

13   system did not work as a deterrent, nor have interventions

14   addressed to his mental health or his addiction issues been

15   effective.  Even three near-death overdoses did not serve to

16   shock Mr. Clark into sobriety or treatment.  Remember that he

17   has received previously a number of crimes, including having

18   received a six-year sentence.  So as a predicative matter, I

19   have no confidence that Mr. Clark can become a productive and

20   law-abiding member of society.  That does not mean that he

21   can't, but based on his history, I am not optimistic.  I hope I

22   am wrong.  Accordingly, because of that, I must take seriously

23   my job to protect the public from further crimes by Mr. Clark.

24          Finally, and of enormous importance here is that the

25   sentence of Mr. Clark, even were it not necessary to deter him,

L5CsCLAs

1    would be justifiable for the reasons of general deterrence.

2    The message must be loud and clear.  Provide or attempt to

3    provide material support and resources to a foreign terrorist

4    organization and you will spend a very long time in jail.

5         In short, I am not persuaded that there is a good

6    reason, a supportable reason, to depart from the guidelines.

7    Accordingly, Mr. Clark is sentenced to 240 months.

8         I place him on supervision for life.  Obviously, if he

9    behaves and shows signs of really addressing his issues and

10   supports the notion that he will not return to a life of crime,

11   whether it is this crime or some other crime, that can, you

12   know, be reduced later.

13        There is a special assessment of $100.

14        And all of the mandatory standard and special

15   conditions set out at pages 33 to 36 of the presentence report

16   are imposed.

17        Let me advise Mr. Clark that if he has not waived his

18   right to appeal, that he has 14 days to file a notice of

19   appeal.

20        Is there anything further at this time?

21        MR. HELLMAN:  The government moves to dismiss

22   Count Two.

23        THE COURT:  Motion is granted.

24        MR. MARVINNY:  Your Honor, I am asking you to consider

25   recommending that the Bureau of Prisons house Mr. Clark as

L5CsCLAs

1    close to the New York City area as possible.

2              THE COURT:  I think that the decision as to his

3    housing probably relates more to his crime than his geography,

4    but if consistent with the crime, there is a location close to

5    New York, I have no problem recommending that.

6              OK.  All right.  I think we're done.  Thank you.

7                            *   *   *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25